**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL LAUGHLIN** and **NICOLE LAUGHLIN**, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08 C 1217 |
| **BORDWOK ENTERPRISES, LLC,** a Georgia limited liability company, and **DANIEL LUCAS,** | ) ) ) ) | Judge Samuel Der-Yeghiayan  Magistrate Judge Susan E. Cox |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs MICHAEL LAUGHLIN, ("**Michael**") and NICOLE LAUGHLIN ("**Nicole**"), and each of them (collectively "**Plaintiffs**"), by their attorneys, John S. Letchinger and Martin D. Snyder, state as follows for their First Amended Complaint ("**Complaint**") against defendants BORDWOK ENTERPRISES, LLC, a Georgia limited liability company, and DANIEL LUCAS ("**Lucas**"), and each of them (collectively "**Defendants**"):

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiffs are individuals domiciled in Chicago, Illinois.

2.    Defendant Bordwok Enterprises, LLC is a limited liability company organized under the laws of Georgia with its principal place of business located in Alpharetta, Georgia. (This defendant, along with any predecessor companies, is referred to hereafter as "**Bordwok**".)

3.    Defendant Lucas is an individual domiciled in Georgia.  He is President and General Manager of Bordwok.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5. Defendants are subject to personal jurisdiction in Illinois pursuant to 735 ILCS 5/2-209 because both defendants are doing business in Illinois, and because the events or omissions giving rise to this claim either occurred in Illinois or were directed at Illinois, and because this action involves the ownership, use, or possession or real estate situated in Illinois.

6. Venue is proper in this judicial district pursuant to 28 U.S. C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

## BACKGROUND

7. In 2005, Lucas and Michael decided to go into business with one another to invest in real estate. They formed "Bordwok Properties, LLC." Bordwok is the successor company to "Bordwok Properties, LLC." Both companies have formed, managed, and acted since their receptive inceptions through various wholly-owned limited liability companies, all of which have been managed and controlled by Lucas. Both Lucas and Michael held ownership interests in "Bordwok Properties, LLC" and later in Bordwok.

8. Bordwok got its start by acquiring two investment properties in Florida. One of the properties was purchased and financed in Michael and Nicole's names, while the other was acquired and financed in Lucas' name.

9. In mid-2005, Bordwok obtained some new investors, which provided the company with some additional capital for its investment activities.

10.    In late 2005, Michael brought to Lucas an idea to move beyond real estate investment and move into residential real estate development.  Specifically, Michael proposed that Bordwok get involved in purchasing residential properties in Chicago, then renovate them or build new structures on the property, and then re-sell the improved properties.  Being based in Chicago, Michael proposed that, under such a scenario, he would be the one to run the Chicago operations.

11.    In November 2005, Michael made a presentation to Bordwok's investors regarding his ideas for Chicago.  Michael proposed that he head up an effort by Bordwok that would focus on identifying, acquiring, developing, and selling residential real estate in the Chicago market,.  Under such a scenario, Michael specifically proposed that he would hold this position on a full time basis, and his return for doing so would be splitting with Bordwok the profits realized for those activities.

12.    The Bordwok investors voted in November 2005 on the scenario outlined by Michael and approved it.  Michael subsequently accepted the job title of Bordwok's President of Chicago Operations.

**Michael's Role with Bordwok**

13.    In the spring of 2006, Michael left his full–time job as a finance director at a Chicago public relations firm and went to work full–time running the Chicago operations as he proposed to Bordwok's investors, with a job title of Bordwok's "President of Chicago Construction."  In that role, Michael was primarily responsible for identifying properties, negotiating purchases, obtaining financing for purchases and for construction, managing construction and development of the properties, and Bordwok's sales activities in Chicago.

14.     For the next two years, Michael performed the following tasks, among others, all aimed at expanding and completing the Bordwok-related Chicago construction projects:

- Obtained a Real Estate license, thus gaining MLS assess to the latest real estate listings, historical sales data, real estate sales contracts, and other tools used to leverage purchases for Bordwok.

- Monitored the local real estate market on a daily basis, and identified and represented Bordwok in the purchase of four new development projects and one long–term condo rental purchase in Chicago.

- Initiated and cultivated commercial banking relationships with multiple bankers, and arranged conventional and commercial financing for all of the Bordwok Chicago projects.

- Provided personal guarantees for the financing on most of the Bordwok projects in Chicago, and obtained financing in his and Nicole's own names for one of the projects.

- Interviewed and hired the architect for the Chicago Bordwok projects, and worked with him regularly through the design process to create a marketable high end product for Bordwok development, revisiting issues with the architect during the construction process when necessary to ensure code compliance and product quality.

- Obtained quotes and secured a policy for general contractor's liability insurance & workman's comp for Bordwok Construction, and filed and obtained a Class "D" general contractor's license with the City of Chicago to allow Bordwok Construction to obtain construction permits in their name.

- Obtained required licenses and proof of insurance form the various subcontractors required by the city for permit, and set up site inspections and obtained signatures from the various inspectors approving the work.

- Hired and supervised Luke Wilkins as Project Manager for the Chicago projects, whose role was to oversee the job sites on a daily basis and execute some of the trades associated with the completion of the homes.

- Managed and supervised all aspects of the construction and renovation of the Chicago properties, performing a portion of the construction and renovation work himself.

- Managed the projects' books and expenses and ensured payments of subcontractors.

- Selected all of the finishes for the homes: flooring, trim, doors, cabinets, countertops, appliances, tile, bath fixtures, paint colors, decking, brick, stone, siding, and act.

- Acquired and managed residential construction projects in Chicago for fee-paying customers.

15.    Michael was not paid a salary by Bordwok for the work he did on the Chicago Bordwok projects from Spring of 2006 to March 2008.

16.    Before Michael quit his full–time job at the public relations firm, Lucas promised Michael that, if Michael would work on the Chicago Bordwok projects full time, Michael would split the profits on those projects with Bordwok once the profits were realized.  Lucas stated that he had the authority on behalf of Bordwok to make such a promise.

17.    Until such time as the Chicago Bordwok projects earned a profit, Lucas further promised that Bordwok would pay Michael a $5,500 per month advance on Michael's share of the future profits.  Although this amount was less than Michael earned per month at his full–time job at the public relations firm, he agreed to take the payment from Bordwok because he expected to reap large financial benefits once the anticipated Chicago Bordwok projects were sold.

### The Damen Building

18.    The first construction project Bordwok undertook in Chicago was the purchase and conversion of a two–flat apartment building at 4317 North Damen Avenue into a single–family home ("**the Damen building**").

19.    Although Michael could have obtained commercial financing for Bordwok to acquire and finance the building in its own name, Lucas rejected this approach as too expensive. Instead, he convinced the Plaintiffs to acquire and finance the building personally, in their own names.

5

20.     Michael and his wife, Nicole, jointly acquired the Damen building in their own names with the intention of renovating it, selling it, and directing the profit back to Bordwok, though subject to Michael's share of the profits as described above.  To that end, the Plaintiffs personally financed the purchase and construction of the Damen building in their own names in the amount of approximately $980,000.

21.     Once the conversion of the Damen building was complete, however, Lucas suggested to the Plaintiffs that, instead of selling the Damen building to a third–party, they could move in to the home and keep it for themselves.  Lucas reasoned that the home would not only be a suitable residence for the Plaintiffs and their family, it would stand as advertising to any future clients of Michael and Bordwok.  In addition, Bordwok would save the real estate agent fees, legal fees, and taxes that would be incurred in a third–party sale, and Bordwok would have a quick and risk–free sale of its first Chicago property.

22.     Consequently, in the Summer of 2007, Lucas promised to the Plaintiffs that they could move in and would receive full and unrestricted ownership of the Damen building in return for paying to Bordwok the profit that would have been realized on the property based upon an assumed $1.2 million sale price to a third–party.  Because the total profit would have been approximately $220,000 in such a sale, the Plaintiffs anticipated that this would result in a net payment to Bordwok of approximately $110,000, after an offset for Michael's own share of the building's profitability.

23.     In addition, Lucas further promised to increase Michael's monthly advance of his share of future profits from $5,500 to $10,500 per month so the Plaintiffs could obtain financing and cover the increased costs of the mortgage on the Damen building relative to the Plaintiffs' previous residence.  Lucas and Michael agreed that the new amount would either be paid directly

6

to Michael by Bordwok, or it would be paid via Bordwok continuing to make the mortgage payments on the property.

24.    Lucas realized that a quick sale of the Damen building would avoid the uncertainty of having the house on the market for a long period of time, and would also provide Bordwok with some needed cash. Lucas also realized that the Damen building likely had a few hundred thousand dollars of equity in it that could be leveraged and paid to Bordwok as part of a sale by the new owners.

25.    Consequently, Lucas approached the Plaintiffs in the Summer of 2007 with the idea that they be the ones to purchase the house. He told them that it would be advantageous for them and Bordwok because money could be saved in realtor, legal, and tax fees in such a transaction, as the Plaintiffs already legally owned the house.

26.    Lucas arranged an appraisal on the home and set up preliminary financing for the Plaintiffs whereby they would give up most of the equity in the home in return for a mortgage that covered nearly the entire purchase price of $1.2 million. The equity in the home—approximately $200,000—would then be realized Bordwok, while the Plaintiffs would be taking over an expensive loan on a house with little to no equity.

27.    In the Summer of 2007, Lucas insisted that the Plaintiffs move in to the house. In order for them to qualify for the financing he had arranged and to cover the higher mortgage payments the Plaintiffs would have to make on the Damen building, Lucas, on his own behalf and behalf of Bordwok, promised that Bordwok would increase its monthly advance profit draw to Michael to $10,500.

28.    In fact, Lucas' promise to the Plaintiffs was false, and Lucas never intended to honor it. The false promise to increase Michael's monthly advance profit draw if he moved into

the house and agreed to the deal was instead made by Lucas as part of a fraudulent scheme to induce the Plaintiffs to put themselves in a vulnerable position in regard to their home so that Bordwok could either realize the $200,000 profit on the sale and discontinue making monthly draw payments to Michael after closing, or Bordwok could later demand more money from the Plaintiffs to acquire the house should the financing fall through.

29.    In reliance on the representations of Lucas and the promises made between the parties, the Plaintiffs rented their old house and moved into the Damen building in October 2007.

30.    Recently, however, Lucas and Bordwok have dishonored the promises they made to the Plaintiffs for the purchase of the Damen building.  Specifically, Lucas has repudiated his agreement to let the Plaintiffs take full and unrestricted ownership of the building based upon a $1.2 million sales price.  Instead, Lucas has demanded immediate payment from the Plaintiffs of $300,000 to $350,000, without even a promise to give up Bordwok's rights in the property in return.

31.    On February 26, 2008, the Plaintiffs received a letter from Bordwok's counsel indicating that Bordwok believes that it has no current agreement with the Plaintiffs pertaining to the Damen building, that it never agreed to allow the Plaintiffs to live there, and that the Plaintiffs must immediately pay to Bordwok the amount of $300,000.

32.    In addition, in further contrivance of the Defendants' promises, Bordwok ceased making the mortgage payments on the Damen Building, and discontinued paying Michael any of the monthly advances on Michael's share of future profits.

### Bordwok's refusal to pay Michael profits on Chicago Projects

33.    To date, Michael has acquired and managed two residential construction projects for Bordwok, wherein Bordwok earned approximately $50,000 in revenue.

34.    Those projects were home renovation/remodeling projects wherein Michael performed all of the same construction management duties he performs on Bordwok's own projects.

35.    The fees paid for these projects were paid directly to Bordwok; i.e., Michael did not retain any of these fees.

36.    Despite Bordwok and Lucas' promise to split the profits of such work with Michael, Bordwok has failed to pay any amounts to Michael from those projects.

37.    Moreover, Michael has, on behalf of Bordwok, acquired, managed, built, or renovated multiple projects in Chicago, including those at 2038 West Cullom, 4242 North Leavitt, 4028 North Oakley, and at State & Randolph.  He also obtained the mortgage and construction financing and personally guaranteed the loans on most of these properties.  While none of those properties have yet been sold to third–parties, some or all are currently listed or will soon be offered to sale to the public.  Based upon the proposed list prices of those properties, Michael expects that the sale of those properties will realize a collective gross profit of over $1,260,000.

38.    In reliance on all of Lucas and Bordwok's promises to Michael, Michael has researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects.

39.    Again, despite Lucas and Bordwok's promises to Michael, Lucas has flatly told Michael that Bordwok will not be sharing with Michael any percentage of the profits on any such job.

### Interference with Chicago Projects

40.     In addition to the refusal by Lucas and Bordwok with respect to the promised profits, the Defendants have begun to take other actions that threaten the progress of the Chicago construction and development projects.

41.     Luke Wilkins is a general foreman Michael hired to assist in managing the construction activities on Bordwok's various Chicago projects.  His salary is paid directly by Bordwok.  Wilkins' work is vital to the completion and ultimate profitability of the Chicago projects.

42.     Recently, however, Bordwok has indicated that it will no longer pay Wilkins' salary, or at least until Michael agrees to Lucas and Bordwok's demand that he pay $300,000 on the Damen property.

43.     In addition, Michael and Bordwok had agreed that they would not hire an independent real estate agent to list the various Chicago development properties when they were ready for sale.  Instead, the two agreed that Michael, who is a licensed real estate agent, would list and show the properties himself, so that they could save the expense of a real estate agent.  Michael explicitly agreed not to take his entitled fee so that he and Bordwok could increase the overall profitability of the projects.  This is consistent with Michael's actions on the Bordwok projects, as he decided to forego his fee on the Damen building purchase, too, to increase overall profits of the deal.

44.     Despite their agreement, Bordwok has recently hired an independent real estate agent to list and sell the properties on Cullom Avenue and on Leavitt Street in Chicago.  Such an expense will inevitably reduce the profitability of the ultimate sale of those properties.

45.    In addition, at Lucas and Bordwok's direction, Michael obtained a credit card that is in Bordwok's name, but is also  personally guaranteed by Michael.  Michael used the credit card for construction–related expenses, and the bill has always been paid by Bordwok.

46.    Recently, however, Bordwok has told Michael that it will no longer pay that credit card bill, and it has, in fact, stopped paying it.

47.    Bordwok's refusal to pay the credit card bill not only jeopardizes Michael's credit rating and exposes him to personal liability for corporate debts, it has hampered the progress of the Chicago projects, as Michael can no longer buy incidental items for those projects.

### The Florida Condominium

48.    At Lucas' suggestion and urging, the Plaintiffs acquired and financed a condominium in Sarasota, Florida in a residential development known as "Vintage Grand."

49.    The Vintage Grand property was originally titled in the names of the Plaintiffs and Lucas, but Lucas subsequently removed his own name from the property's title, ostensibly so he could free himself up to purchase another property.  The property is therefore now titled in the Plaintiffs' names only, and the Plaintiffs are the mortgagors on the property.  The mortgage loan balance is currently approximately $137,000.

50.    The Plaintiffs acquired the property at the request and direction of Lucas and Bordwok.  The intention of the acquisition was to derive rental income from the property in the short term, and ultimately to re–sell the property at a profit.  All profits realized on the property were to be split between the Plaintiffs and Bordwok.

51.    In addition to the mortgage that financed the purchase of the property, at Lucas' direction the Plaintiffs also obtained a $105,000 line of credit secured by the property.  Also at Lucas' direction, the Plaintiffs withdrew the $105,000 and promptly transferred it to Bordwok. It

was the Plaintiffs' understanding that Bordwok would use the money for the various Chicago projects, as well as for improvement of the Vintage Grand property itself.

52.    Lucas' name, too, was originally on the title of the Vintage Grand property. Prior to directing the Plaintiffs to take out the additional $105,000 line of credit, however, Lucas convinced the Plaintiffs to allow him to take his name off the property's title, ostensibly so he could purchase some other property himself.

53.    Recently, however, Lucas and Bordwok have indicated to Michael that Bordwok is not be willing to continue paying the mortgage and line of credit associated with the Vintage Grand property, but instead prefers to allow the loans to be foreclosed upon. Such a foreclosure, of course, would aversely affect Plaintiffs' credit ratings and would expose them to liability for any deficiencies between the amounts borrowed and the sale price of the property, as the property and its loans are not in Bordwok's name, but in the Plaintiffs' names.

54.    In addition, despite Bordwok's recent assurances that it will continue to pay the loans associated with the Vintage Grand property, it has in fact failed to do so, even going so far as to cancel at least one payment check it had recently submitted to the lender for one of the property's loans.

55.    Moreover, Bordwok has—without notice to the Plaintiffs or their consent—transferred the property's utilities and insurance to the Plaintiffs' names and address.

56.    Finally, despite repeated requests by Michael, Lucas and Bordwok have refused to provide any explanation or accounting to the Plaintiffs regarding the amount of rental income that has been generated by the property, or regarding the whereabouts of the $105,000 the Plaintiffs provided to Bordwok.

## Lucas and Bordwok's Defamatory Statements

57.     Recently, Michael has come under increasing mistreatment by Lucas and Bordwok.

58.     On multiple occasions in the past several months, Lucas, on his own behalf and on behalf of Bordwok, has made defamatory, disparaging, and untrue statements regarding Michael and Michael's ability to do his job.

59.     By way of example, Lucas made the following statements on the following occasions:

- On December 10, 2007, on a conference call with Rob Gavin, Chris Mitchell, Mike Laughlin, Jason Blair, Lucas falsely represented that Michael was unorganized, irresponsible, and incompetent, that the company could not move on to fund other projects because $1 million of Bordwok's money was tied up in Chicago due to Michael's poor performance, and he told the others that Bordwok cannot account for every penny of Bordwok's money that Michael has spent.

- On February 20, 2008, Lucas sent an e-mail message to Chris Mitchell, Rob Gavin, Luke Wilkins, and Jerry Lucas wherein he implied that Michael had mishandled the company's finances.

- On February 7, 2008, Lucas made a telephone call to Jason Blair and Luke Wilkins wherein he falsely claimed that Michael was jeopardizing the company's future by failing to turn over the Damen building.

- On repeated occasions, Lucas called Chris Mitchell and falsely told him, among other things, that Michael is incompetent, doing a bad job, is holding up further Boardwalk ventures, and is responsible for Bordwok being unable to launch the planned Bordwok Mortgage venture.

## Michaels' demand for financial information from Bordwok

60.     Due in part to Lucas' increasingly hostile attitude toward Michael, Michael began to have serious doubts about the fiscal health of Bordwok, of which Michael is an investor and a Member.

61.    In addition, Lucas has informed Michael that, while the Chicago properties owned by Bordwok are doing well financially, the Florida properties are not faring as well. Upon information and belief, Bordwok's Florida properties are decreasing rapidly in value, and foreclosures may be imminent.

62.    Concerned about the finances of the company, Michael requested of Lucas complete access to Bordwok's books so that he could evaluate the value of his investment. Such is Michael's right pursuant to 16.1 of Bordwok's Amended and Restated Operating Agreement.

63.    Section 16.1 of the Operating Agreement provides in part that, "Any Member or such member's duly authorized representative, subject to reasonable standards established by the General Manager governing what information and documents are to be furnished at what time and location and at whose expense, shall have the right at any time, for any purpose reasonably related to such member's Unit, to inspect and copy from such books and documents during normal business hours."

64.    Lucas and Bordwok, however, have steadfastly refused Michael as well as other Bordwok investors any such access.

## COUNT I
### (Michael v. Defendants -- Defamation per se)

65.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re–alleges them for this paragraph of Count I of the Complaint as though fully set forth herein.

66.    The false statements about Michael made by Lucas were made on his own behalf and on behalf of Bordwok.

67.    The statements made by Lucas impugned Michael's professional integrity, imputed an inability to perform or a lack of integrity in the discharge of his duties at Bordwok, and imputed a lack of ability on his part in his trade.

68.    The statements constitute Defamation per se under the law, and, as such, no damages need be proven for them to be actionable.  Regardless, the statements were intended to and did in fact cause harm to Michael's reputation and standing among others in the community. As a result, Michael has suffered pecuniary damages.

WHEREFORE, Michael Laughlin prays that this Court enter a judgment in its favor and against the defendants on Count I of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT II

### (Plaintiffs v. Bordwok – Breach of Contract – Damen Building)

69.    The Plaintiffs incorporate paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count II of the Complaint as though fully set forth herein.

70.    The Plaintiffs and Bordwok entered a valid and enforceable contract in regard to the Damen building.  The Plaintiffs promised to pay to Bordwok the gross profits of the Damen Building based upon an assumed $1.2 million sale price, and Bordwok promised in return to transfer to the Plaintiffs any rights it has in the building, as well as to make the transaction possible by increasing Michael's monthly advance profits payment.

71.    The Plaintiffs have completed, or stand willing to complete, all conditions required of them under the contract.

72.    Bordwok, however, has breached that contract by ceasing to make mortgage payments on the property, ceasing to make Michael's increased advances on his share of the profits, by demanding additional compensation that was not agreed to, and by insisting that no such agreement ever existed between the parties.

73.     The Plaintiffs have been damaged and will continue to be damaged by Bordwok's breach of the contract.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count II of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT III

### (Plaintiffs v. Bordwok – Promissory Estoppel – Damen Building)

74.     The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count III of the Complaint as though fully set forth herein.

75.     This Count is pled in the alternative.  The facts alleged in this Count are alleged without prejudice to any other allegations made in the Plaintiffs' Complaint.

76.     Bordwok, via Lucas, promised the Plaintiffs that if they moved into the Damen Building and paid to Bordwok the gross profits of the Damen Building based upon an assumed $1.2 million sale price, Bordwok would transfer to the Plaintiffs any rights it has in the building, and would make the transaction possible by increasing Michael's monthly advance profits payment.

77.     The Plaintiffs reasonably relied on Bordwok's promise, and they vacated their old house, moved into the new house, and arranged for financing for the new house.

78.     The Plaintiffs' reliance on Bordwok's promise was expected and foreseeable by Bordwok.

79.     The Plaintiffs' reliance on Bordwok's promise, however, was to their detriment, as Bordwok's refusal to fulfill its promise has left Plaintiffs in a new house that they cannot afford and are in danger of losing. The Plaintiffs have suffered pecuniary damages as a direct result of Bordwok's actions.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count III of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT IV

### (Michael v. Bordwok – Breach of Contract – Failure to split profits)

80.     Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re-alleges them for this paragraph of Count IV of the Complaint as though fully set forth herein.

81.     Michael and Bordwok entered into a valid and enforceable contract in regard to his compensation for work performed on Bordwok's Chicago projects. In return for Michael's work for Bordwok in acquiring, financing, and managing Bordwok's Chicago projects, Bordwok promised to compensate Michael by sharing with him the profits of those projects, both in the future when the profits are finally realized, as well as before that time via monthly advances.

82.     Michael has completed, or stands willing to complete, all conditions required of him by the parties' contract.

83.     Bordwok, however, has breached that contract by failing to pay Michael the advances on his share of profits owed to him, by refusing to pay all future shares owed to him, and by denying that any agreement ever existed to split profits with him.

84.    As a direct and proximate result of Bordwok's breach, Michael has been damaged in an amount equaling at least $680,000.

WHEREFORE, Michael Laughlin prays that this Court enter a judgment in its favor and against Bordwok on Count IV of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT V

### (Michael v. Bordwok – Quantum Meruit – Failure to split profits)

85.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re-alleges them for this paragraph of Count V of the Complaint as though fully set forth herein.

86.    This Count is pled in the alternative.  The facts alleged in this Count are alleged without prejudice to any other allegations made in the Plaintiffs' Complaint.

87.    Since the Spring of 2006, Michael has preformed extensive work on behalf of Bordwok, which included researching, finding, negotiating, acquiring, financing, managing, and financially guaranteeing Bordwok's Chicago projects.

88.    Michael performed the work based on Lucas' promise that he would be compensated by Bordwok by splitting with it the ultimate profits derived from the project, both in the future and in the form of monthly advance payments.

89.    It was Michael's expectation that his share would be 50% of the total profits earned on the Bordwok development projects and 80% on the fee-based construction projects acquired and managed by Michael, which would be a fair return given the breadth and scope of Michael's work and investment dedicated to the projects.

90.     Michael's efforts have conferred a benefit upon Bordwok, insofar as Bordwok now stands ready to realize profits on the sale of the various properties in Chicago upon which Michael has worked.

91.     Bordwok, however, has stopped paying Michael the advances on the projects' profits that it was previously paying to him, and has further informed Michael that it will not be sharing with him in the future any of the profits ultimately realized from the Chicago projects.

92.     Bordwok's retention of the benefits of Michael's work without further payment is unjust, as Michael researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects in return for the promised share of the projects' profits. Moreover, Bordwok knew throughout the time that Michael was performing his services on the Chicago projects that he was working under the expectation that he would be so compensated.

93.     As a direct and proximate result of Bordwok's unjust retention of the compensation owed to him, Michael has been damaged in an amount equaling at least $680,000.

WHEREFORE, Michael Laughlin prays that this Court enter a judgment in its favor and against the defendants on Count V of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

Michael demands trial by jury.

## COUNT VI

### (Plaintiffs v. Bordwok – Breach of Contract – Vintage Grand)

94.     The Plaintiffs incorporate paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count VI of the Complaint as though fully set forth herein.

95.     The Plaintiffs and Bordwok entered a valid and enforceable contract in regard to the Vintage Grand property.  At Lucas' insistence, the Plaintiffs personally acquired and financed the property, obtained a $105,000 loan secured by the property the proceeds of which they provided to Bordwok, and they allowed Bordwok to manage the property and derive and retain all rental income earned from the property.  In return, Bordwok promised to make all loan payments, cover all operating costs on the property, and split with the Plaintiffs any profits realized from the sale of the property.

96.     The Plaintiffs have completed all conditions required of them under the contract.

97.     Bordwok, however, has breached that contract by ceasing to make loan payments on the property and payments of the operating costs.

98.     The Plaintiffs have been damaged and will continue to be damaged by Bordwok's breach of the contract.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count VI of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT VII

### (Plaintiffs v. Bordwok – Promissory Estoppel – Vintage Grand)

99.     The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count VII of the Complaint as though fully set forth herein.

100.    This Count is pled in the alternative.  The facts alleged in this Count are alleged without prejudice to any other allegations made in the Plaintiffs' Complaint.

101.    Bordwok, via Lucas, promised the Plaintiffs that if they acquired and financed the Vintage Grand property, obtained a $105,000 loan secured by the property and conveyed the proceeds to Bordwok, and they allowed Bordwok to manage the property and derive and retain all rental income earned from the property, Bordwok would make all loan payments, cover all operating costs on the property, and split with the Plaintiffs any profits realized from the sale of the property.

102.    The Plaintiffs reasonably relied on Bordwok's promise, and took all of the actions Lucas requested of them.

103.    The Plaintiffs' reliance on Bordwok's promise was expected and foreseeable by Bordwok.

104.    The Plaintiffs' reliance on Bordwok's promise, however, was to their detriment, as Bordwok's refusal to fulfill its promise has left Plaintiffs responsible for all costs associated with the Vintage Grand property, and the risk of a personal default on their credit rating.  The Plaintiffs have suffered pecuniary damages as a direct result of Bordwok's actions.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count VII of the Complaint in an amount exceeding $75,000, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT VIII

### (Plaintiffs v. Defendants – Fraud – Vintage Grand)

105.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count VIII of the Complaint as though fully set forth herein.

106.    Lucas, on his own behalf and on behalf of Bordwok, made the following promises to the Plaintiffs:

- In January 2005, Lucas promised the Plaintiffs that Bordwok would make all mortgage payments on the Vintage Grand property;

- In January 2005, Lucas promised that Bordwok would pay all operating costs on the property, including utilities, taxes, condo association fees, and insurance;

- In January 2005, Lucas promised that Bordwok would split with the Plaintiffs the profits realized by an eventual sale of the property; and

- In May 2006, after Lucas convinced the Plaintiffs to allow him to remove his name from the property's title, Lucas promised that Bordwok would make all payments (including principal and interest) on outstanding amounts on the line of credit secured by the property.

- In May 2006, after Lucas convinced the Plaintiffs to allow him to remove his name from the property's title, Lucas promised that Bordwok would make all payments (including principal and interest) on outstanding amounts on the line of credit secured by the property, even though he was no longer on the title of the property.

-

107.    All of the promises made by Lucas to the Plaintiffs were false, and Lucas never intended to honor them.  The false promises were instead made by Lucas as part of a fraudulent scheme to induce the Plaintiffs to invest their money and credit in the Vintage Grand property as well as to induce them to pay the entire proceeds of the line of credit directly to Bordwok, which Lucas accomplished after he convinced the Plaintiffs to allow him to remove his own name from the property's title.  Lucas made the false promises with the intention that the Plaintiffs would rely on his promises and make the expected investments and payments.

108.    The Plaintiffs reasonably relied on Lucas' fraudulent promises when they acquired and financed the Vintage Grand property in their own names, when they obtained a line of credit secured by the property and paid the entire $105,000 to Bordwok, and when they allowed Bordwok to retain all rental income derived from the property.

109.    As a proximate result of Lucas' false promises and the Plaintiffs' reasonable reliance on them, the Plaintiffs have suffered pecuniary damages. Bordwok has ceased making loan payments on the property and has also stopped paying the property's operating costs, as well. The Plaintiffs now must shoulder all of those costs, as well as the loss of all rental income from the property and the $105,000 they paid to Bordwok from the line of credit, which was provided to Bordwok only after Lucas removed himself from the property's title.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count VIII of the Complaint in an amount exceeding $75,000, plus punitive damages, interest, and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT IX

### (Plaintiffs v. Defendants – Fraud – Damen House)

110.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count IX of the Complaint as though fully set forth herein.

111.    In the Summer of 2007, Lucas realized that a quick sale of the Damen building would avoid the uncertainty of having the house on the market for a long period of time, and would also provide Bordwok with some needed cash. Lucas also realized that the Damen building likely had a few hundred thousand dollars of equity in it that could be leveraged and paid to Bordwok as part of a sale by the new owners.

112.    Consequently, Lucas approached the Plaintiffs in the Summer of 2007 with the idea that they be the ones to purchase the house. He told them that it would be advantageous for

them and Bordwok because money could be saved in realtor, legal, and tax fees in such a transaction, as the Plaintiffs already legally owned the house.

113.    Lucas arranged an appraisal on the home and set up preliminary financing for the Plaintiffs whereby they would give up most of the equity in the home in return for a mortgage that covered nearly the entire purchase price of $1.2 million.  The equity in the home—approximately $200,000—would then be realized Bordwok, while the Plaintiffs would be taking over an expensive loan on a house with little to no equity.

114.    In the Summer of 2007, Lucas insisted that the Plaintiffs move in to the house.  In order for them to qualify for the financing he had arranged and to cover the higher mortgage payments the Plaintiffs would have to make on the Damen building, Lucas, on his own behalf and behalf of Bordwok, promised that Bordwok would increase its monthly advance profit draw to Michael to $10,500.

115.    In fact, Lucas' promise to the Plaintiffs was false, and Lucas never intended to honor it.  The false promise to increase Michael's monthly advance profit draw if he moved into the house and agreed to the deal was instead made by Lucas as part of a fraudulent scheme to induce the Plaintiffs to put themselves in a vulnerable position in regard to their home so that Bordwok could either realize the $200,000 profit on the sale and discontinue making monthly draw payments to Michael after closing, or Bordwok could later demand more money from the Plaintiffs to acquire the house should the financing fall through.

116.    Lucas made the false promise with the intention that the Plaintiffs would rely on his promise.

117.    The Plaintiffs reasonably relied on Lucas' fraudulent promise when they rented and moved out of their old house, when they moved into the Damen building, and when they obtained financing for the Damen building.

118.    As a proximate result of Lucas' false promise and the Plaintiffs' reasonable reliance on it, the Plaintiffs have suffered pecuniary damages.  Bordwok has ceased making mortgage payments on the Damen building, has stopped paying Michael's advance profit draws, and has demanded additional money from the Plaintiffs to allow them to stay in the house.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count IX of the Complaint in an amount exceeding $75,000, plus punitive damages, interest, and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT X

### (Michael v. Defendants – Fraud – Chicago Projects)

119.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re–alleges them for this paragraph of Count X of the Complaint as though fully set forth herein.

120.    In November 2005 at or near the time Michael made his presentation to the Bordwok investors, and then again in Spring of 2006 when Michael left his prior job to manage Bordwok's Chicago operations full time, Lucas, on his own behalf and on behalf of Bordwok, promised Michael that, if he would perform the full time work required to acquire, develop, finance, and construct the Chicago properties, Michael would split with Bordwok the profits from the eventual sale of the properties.

121.    Michael reasonably relied on these promises when he decided to go to work with Bordwok, and when he researched properties for Bordwok, negotiated their sale, obtained

mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects.

122.    Subsequently, in late 2006 and into 2007, Lucas continued to make those same promises to Michael that he would ultimately be compensated for his work by splitting profits with Bordwok.  Michael reasonably relied on those promises, too, when he decided to continue to research properties for Bordwok, negotiate their sale, obtain mortgage and construction financing for them, personally guarantee the loans, hire contractors, and manage the construction of the projects.

123.    All of the promises made by Lucas to Michael regarding splitting the profits were false, however, and Lucas never intended to honor them.  The false promises were instead made by Lucas as part of a fraudulent scheme to induce Michael to work and to continue to work on Bordwok's behalf; to wit, researching properties for Bordwok, negotiating their sale, obtaining mortgage and construction financing for them, personally guaranteeing the loans, hiring contractors, and managing the construction of the projects.

124.    Lucas made the false promises with the intention that the Michael would rely on his promises and make the expected and anticipated investment in time and money toward the properties, and become financially committed to each property.

125.    Michael reasonably relied on Lucas' fraudulent promises when he went to work managing Bordwok's Chicago operations, and in deciding to continue that work, when he researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects—promise after promise, property after property.

126.    As a proximate result of Lucas' false promises and Michael's reasonable reliance on them, Michael has suffered pecuniary damages.  Bordwok has ceased making advance profit draw payments to Michael, and Lucas has flatly told Michael that Bordwok will not be splitting any profits with him.  Michael's pecuniary damages total in excess of $680,000.

WHEREFORE, Michael prays that this Court enter a judgment in his favor and against the Defendants on Count X of the Complaint in an amount exceeding $75,000, plus punitive damages, interest, and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT XI

### (Plaintiffs v. Defendants – Breach of Fiduciary Duty)

127.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint, as well as all paragraphs of Counts IV and VI, and re–allege them for this paragraph of Count XI of the Complaint as though fully set forth herein.

128.    Bordwok and Michael entered a valid agreement to acquire, develop, and sell the Chicago properties and split the profits from the sales of those properties.  Bordwok also entered a valid agreement with the Plaintiffs to acquire and sell the Vintage Grand property and split the profits.

129.    Bordwok and Michael are therefore joint adventurers in regard to the Chicago projects, and Bordwok and the Plaintiffs are joint adventurers in regard to the Vintage Grand property.

130.    Bordwok therefore owes to the Plaintiffs fiduciary duties of good faith and fair dealing, among others, especially in light of the unbalanced and unequal position of the parties.

131.    Bordwok, however, has breached that duty to Michael in regard to the Chicago projects by refusing to pay him his share of the profits realized from the Chicago projects, and instead channeling the money to its own selfish uses.

132.    Moreover, Bordwok has breached its duty to the Plaintiffs in regard to the Vintage Grand property by ceasing to make the loan payments and misappropriating the $105,000 that the Plaintiffs provided to Bordwok.

133.    Bordwok's breaches have been effected and executed by, among others, Lucas.

134.    The Plaintiffs have been damaged and will continue to be damaged by Bordwok's breach of their fiduciary duties.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against Bordwok on Count X of the Complaint in an amount exceeding $75,000, including the imposition of punitive damages, plus interest and costs of suit.

The Plaintiffs demand trial by jury.

## COUNT XII

### (Plaintiffs v. Defendants – Accounting)

135.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint, as well as all of the allegations contained in Counts VIII, IX, X, and XI, and re–allege them for this paragraph of Count XII of the Complaint as though fully set forth herein.

136.    In light of the fraudulent actions and breaches of fiduciary duties, detailed herein as well as Lucas' repeated refusals to Michael's requests for financial records access, the Plaintiffs require access to all of Bordwok's financial and business records, as well as that of its related LLC's, so that they may learn whether their misappropriated funds still exist, or where

they have gone, as well as where their investment dollars have gone or whether they even still exist.

137.    Michael, as an investor, part owner, and Member of Bordwok, has requested this information pursuant to Section 16.1 of the Bordwok Operating Agreement, but he has been refused.

138.    Likewise, the Plaintiffs' demands for financial information related to Vintage Grand—including the whereabouts of the $105,000—have been denied.

139.    The Plaintiffs have a need for this information, but they have no adequate remedy at law to obtain it.

140.    Bordwok should therefore be compelled to make an Accounting to the Plaintiffs of all of Bordwok's financial and business information, including all of its subsidiaries, as soon as is practicable.

141.    In addition, the Bordwok should be compelled to make an Accounting to the Plaintiffs of all income and expenditure information related to Vintage Grand, as well as of the $105,000 the Plaintiffs provided to Bordwok that is secured by the Vintage Grand property.

142.    Moreover, Lucas himself is the manager or chief executive of Bordwok and all of its related entities.  Consequently, he has all of the knowledge and information regarding the substance of the information sought by the Plaintiffs, and is on information and belief in actual possession of the information.

WHEREFORE, the Plaintiffs pray that this Court enter a judgment in their favor and against the Defendants on Count XII of the Complaint, and that it enter an order compelling (1) the Defendants to make an Accounting to the Plaintiffs of all of Bordwok's financial and business information, including its related limited liability companies, as soon as is practicable;

and (2) the Defendants to make an Accounting to the Plaintiffs of all income and expenditure information related to Vintage Grand, as well as of the $105,000 the Plaintiffs provided to the Defendants that is secured by the Vintage Grand property as soon is practicable.

## COUNT XIII

### (Michael v. Defendants – Constructive Trust)

143.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint, as well as all of the allegations contained in Counts VIII, X and XI, and re–alleges them for this paragraph of Count XIII of the Complaint as though fully set forth herein.

144.    In light of the Defendants' fraudulent actions and breaches of fiduciary duty in wrongly retaining the share of the profits that are clearly owed to Michael, the Court should not allow Bordwok to realize the full profits of the various projects outlined herein without paying those amounts to Michael.  Any such profits Bordwok receives that are owed to Michael are wrongfully in its hands.

145.    Moreover, as General Manager of all Bordwok entities and related limited liability companies, Lucas should be enjoined from disposing of or distributing any of the profits from those sales without making payment to Michael.

146.    Consequently, this Court should impose a constructive trust in favor of Michael and against Bordwok for all amounts (1) currently possessed by Bordwok but owed to Michael for his share of the profits on the multiple Bordwok projects in Chicago, including those at 2038 West Cullom, 4242 North Leavitt, 4028 North Oakley, and at State & Randolph, as well as the profits realized on the fee-based renovation projects managed by Michael and (2) realized by Bordwok in the future from the sale of those properties.

WHEREFORE, Michael Laughlin prays that this Court enter a judgment in its favor and against the Defendants on Count XIII of the Complaint, and that it impose a constructive trust in favor of Michael and against Defendants for all amounts (1) currently possessed by Bordwok but owed to Michael for his share of the profits on the multiple Bordwok projects in Chicago, including those at 2038 West Cullom, 4242 North Leavitt, 4028 North Oakley, and at State & Randolph, as well as the profits realized on the fee-based renovation projects managed by Michael and (2) realized by Bordwok in the future from the sale of those properties.

## COUNT XIV

### (Plaintiffs v. Defendants – Declaratory Judgment)

147.    The Plaintiffs incorporate by reference all allegations in Counts I through XIII of this Complaint, and re-allege them for this paragraph of Count XIIV of the Complaint as though fully set forth herein.

148.    A dispute has arisen between the Plaintiffs and the Defendants as to the parties' rights and interests in relation to one another.

149.    An actual existing and bona fide controversy exists between the Plaintiffs and the Defendants that can be determined only by a declaratory judgment.

150.    Under Rule 57 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. § 2201–2202, this Court is vested with the power to declare the rights and liabilities of the parties hereto.

WHEREFORE, the Plaintiffs request a declaration from the Court that the Defendants are contractually obligated to:

a)  Pay the mortgage and line of credit payments of the Vintage Grand property;

b)  Split with the Plaintiffs the profits from the sale of the Vintage Grand property;

c) Pay the mortgage on the Damen building, or continue to pay the promised advance profit draw payments to Michael to cover the payments;

d) Pay Michael his split of the profits on the fee-based construction projects he acquired and managed on behalf of Bordwok;

e) Split with Michael the profits from the sale of the Chicago area properties acquired and developed by Michael with Bordwok, including those at 2038 West Cullom, 4242 North Leavitt, 4028 North Oakley, and at State & Randolph,;

f) Provide the Plaintiffs with access to Bordwok's books and other financial information, including the details of the rental income derived form the Vintage Grand property and the whereabouts of the $105,000 provided by the Plaintiffs to Bordwok.

Dated:  April 16, 2008

MICHAEL & NICOLE LAUGHLIN

By: ___s/ Martin D. Snyder_____
                          One of their Attorneys

John S. Letchinger
Martin D. Snyder
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229
(312) 201-2000
(312) 201-2500 (fax)

*Attorneys for Plaintiffs*
  *Michael & Nicole Laughlin*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and also certifies that the document is being served on the following persons in compliance with CM/ECF requirements which generate service through the Court's electronic filing system, or, where appropriate, via U.S. Mail delivery from 225 West Wacker Drive, Chicago, Illinois, postage prepaid, on April 16, 2007:

Martin B. Carroll, Esq.
Josh Goldberg, Esq.
Fox, Hefter, Swibel, Levin & Carroll, LLP
200 West Madison Street
Chicago, Illinois 60606

/s/ Martin Snyder
Martin D. Snyder,
Attorney at Law