**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL LAUGHLIN and      )
NICOLE LAUGHLIN,           )
                            )
      Plaintiffs,         )
                            )     No. 08 C 1217
v.                        )
                            )     Judge Der-Yeghiayan
BORDWOK ENTERPRISES, LLC,   )
A Georgia limited liability company, and )     Magistrate Judge Cox
DANIEL LUCAS,           )
                            )
      Defendants.        )
_____)
BORDWOK ENTERPRISES, LLC,   )
A Georgia limited liability company,   )
                            )
      Counter-plaintiff,    )
v.                        )
                            )
MICHAEL LAUGHLIN and      )
NICOLE LAUGHLIN           )
                            )
      Counter-defendants.   )

**ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIM BY**
**DEFENDANTS BORDWOK ENTERPRISES, LLC**
**AND DANIEL LUCAS**

Defendants Bordwok Enterprises, LLC ("Bordwok") and Daniel Lucas ("Defendants") respond to the First Amended Complaint ("Complaint") as follows:

**ANSWER TO FIRST AMENDED COMPLAINT**

1.     Plaintiffs are individuals domiciled in Chicago, Illinois.

**ANSWER:**    Defendants admit the allegations in paragraph 1.

2.     Defendant Bordwok Enterprises, LLC is a limited liability company organized under the laws of Georgia with its principal place of business in Alpharetta, Georgia. (This defendant, along with any predecessor companies, is referred to hereafter as "**Bordwok**".)

**ANSWER:**    Defendants admit the allegations in paragraph 2 except that Defendants construe all references to "Bordwok" in the Complaint to refer only to Defendant Bordwok Enterprises, LLC and to no other entities or persons.

3.    Defendant Lucas is an individual domiciled in Georgia.  He is President and General Manager of Bordwok.

**ANSWER:**    Defendants admit the allegations in paragraph 3.

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

**ANSWER:**    Defendants admit the allegations in paragraph 4.

5.    Defendants are subject to personal jurisdiction in Illinois pursuant to 735 ILCS 5/2-209 because both defendants are doing business in Illinois, and because the events or omissions giving rise to this claim either occurred in Illinois or were directed at Illinois, and because this action involves the ownership, use, or possession or real estate situated in Illinois.

**ANSWER:**    Defendants admit that they are subject to personal jurisdiction and deny the remaining allegations in paragraph 5.

6.    Venue is proper in this judicial district pursuant to 28 U.S. C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

**ANSWER:**    Defendants admit the allegations in paragraph 6.

## BACKGROUND

7.    In 2005, Lucas and Michael decided to go into business with one another to invest in real estate.  They formed "Bordwok Properties, LLC."  Bordwok is the successor company to "Bordwok Properties, LLC."  Both companies have formed, managed, and acted since their

receptive inceptions through various wholly-owned limited liability companies, all of which have been managed and controlled by Lucas. Both Lucas and Michael held ownership interests in "Bordwok Properties, LLC" and later in Bordwok.

**ANSWER:** Defendants admit that Mr. Lucas and Mr. Laughlin held ownership interests in Bordwok Properties, LLC and in Bordwok and deny the remaining allegations in paragraph 7. Defendants further state that Bordwok was formed by Mr. Lucas and Ms. Christine Kurzydlo, and that Mr. Laughlin subsequently became a member.

8.    Bordwok got its start by acquiring two investment properties in Florida. One of the properties was purchased and financed in Michael and Nicole's names, while the other was acquired and financed in Lucas' name.

**ANSWER:** Defendants deny the allegations in paragraph 8. Defendants further state that Bordwok acquired three investment properties in Florida. One of the properties was purchased and financed in the name of Mr. and Ms. Laughlin; one was purchased and financed in the name of Susan Lucas; and one was purchased and financed in the name of Mr. Lucas.

9.    In mid-2005, Bordwok obtained some new investors, which provided the company with some additional capital for its investment activities.

**ANSWER:** Defendants admit the allegations in paragraph 9.

10.    In late 2005, Michael brought to Lucas an idea to move beyond real estate investment and move into residential real estate development. Specifically, Michael proposed that Bordwok get involved in purchasing residential properties in Chicago, then renovate them or build new structures on the property, and then re-sell the improved properties. Being based in Chicago, Michael proposed that, under such a scenario, he would be the one to run the Chicago operations.

**ANSWER:** Defendants deny the allegations in paragraph 10.

11.    In November 2005, Michael made a presentation to Bordwok's investors regarding his ideas for Chicago.  Michael proposed that he head up an effort by Bordwok that would focus on identifying, acquiring, developing, and selling residential real estate in the Chicago market,.  Under such a scenario, Michael specifically proposed that he would hold this position on a full time basis, and his return for doing so would be splitting with Bordwok the profits realized for those activities.

**ANSWER:**    Defendants deny the allegations in paragraph 11.

12.    The Bordwok investors voted in November 2005 on the scenario outlined by Michael and approved it.  Michael subsequently accepted the job title of Bordwok's President of Chicago Operations.

**ANSWER:**    Defendants deny the allegations in paragraph 12.

### Michael's Role with Bordwok

13.    In the spring of 2006, Michael left his full–time job as a finance director at a Chicago public relations firm and went to work full–time running the Chicago operations as he proposed to Bordwok's investors, with a job title of Bordwok's "President of Chicago Construction."  In that role, Michael was primarily responsible for identifying properties, negotiating purchases, obtaining financing for purchases and for construction, managing construction and development of the properties, and Bordwok's sales activities in Chicago.

**ANSWER:**    Defendants admit that Mr. Laughlin served as President of Bordwok Construction, LLC and deny the remaining allegations in paragraph 13.

14.    For the next two years, Michael performed the following tasks, among others, all aimed at expanding and completing the Bordwok-related Chicago construction projects:

- Obtained a Real Estate license, thus gaining MLS assess to the latest real estate listings, historical sales data, real estate sales contracts, and other tools used to leverage purchases for Bordwok.

4

- Monitored the local real estate market on a daily basis, and identified and represented Bordwok in the purchase of four new development projects and one long–term condo rental purchase in Chicago.

- Initiated and cultivated commercial banking relationships with multiple bankers, and arranged conventional and commercial financing for all of the Bordwok Chicago projects.

- Provided personal guarantees for the financing on most of the Bordwok projects in Chicago, and obtained financing in his and Nicole's own names for one of the projects.

- Interviewed and hired the architect for the Chicago Bordwok projects, and worked with him regularly through the design process to create a marketable high end product for Bordwok development, revisiting issues with the architect during the construction process when necessary to ensure code compliance and product quality.

- Obtained quotes and secured a policy for general contractor's liability insurance & workman's comp for Bordwok Construction, and filed and obtained a Class "D" general contractor's license with the City of Chicago to allow Bordwok Construction to obtain construction permits in their name.

- Obtained required licenses and proof of insurance form the various subcontractors required by the city for permit, and set up site inspections and obtained signatures from the various inspectors approving the work.

- Hired and supervised Luke Wilkins as Project Manager for the Chicago projects, whose role was to oversee the job sites on a daily basis and execute some of the trades associated with the completion of the homes.

- Managed and supervised all aspects of the construction and renovation of the Chicago properties, performing a portion of the construction and renovation work himself.

- Managed the projects' books and expenses and ensured payments of subcontractors.

- Selected all of the finishes for the homes: flooring, trim, doors, cabinets, countertops, appliances, tile, bath fixtures, paint colors, decking, brick, stone, siding, and act.

- Acquired and managed residential construction projects in Chicago for fee-paying customers.

    **ANSWER:**    Defendants admit that Mr. Laughlin supervised Bordwok's construction activities in Chicago at one time and deny the remaining allegations in paragraph 14.

    15.    Michael was not paid a salary by Bordwok for the work he did on the Chicago Bordwok projects from Spring of 2006 to March 2008.

**ANSWER:**     Defendants deny the allegations in paragraph 15.

16.     Before Michael quit his full–time job at the public relations firm, Lucas promised Michael that, if Michael would work on the Chicago Bordwok projects full time, Michael would split the profits on those projects with Bordwok once the profits were realized.  Lucas stated that he had the authority on behalf of Bordwok to make such a promise.

**ANSWER:**     Defendants deny the allegations in paragraph 16.

17.     Until such time as the Chicago Bordwok projects earned a profit, Lucas further promised that Bordwok would pay Michael a $5,500 per month advance on Michael's share of the future profits.  Although this amount was less than Michael earned per month at his full–time job at the public relations firm, he agreed to take the payment from Bordwok because he expected to reap large financial benefits once the anticipated Chicago Bordwok projects were sold.

**ANSWER:**     Defendants deny the allegations in paragraph 17.

### The Damen Building

18.     The first construction project Bordwok undertook in Chicago was the purchase and conversion of a two–flat apartment building at 4317 North Damen Avenue into a single–family home ("**the Damen building**").

**ANSWER:**     Defendants admit the allegations in paragraph 18.

19.     Although Michael could have obtained commercial financing for Bordwok to acquire and finance the building in its own name, Lucas rejected this approach as too expensive. Instead, he convinced the Plaintiffs to acquire and finance the building personally, in their own names.

**ANSWER:**     Defendants deny the allegations in paragraph 19.

20.    Michael and his wife, Nicole, jointly acquired the Damen building in their own names with the intention of renovating it, selling it, and directing the profit back to Bordwok, though subject to Michael's share of the profits as described above.  To that end, the Plaintiffs personally financed the purchase and construction of the Damen building in their own names in the amount of approximately $980,000.

**ANSWER:**    Defendants deny the allegations in paragraph 20.  Defendants further state that Mr. Laughlin entered into an agreement with Bordwok pursuant to which:

a)    Mr. Laughlin would obtain financing for the purchase and renovation of the Damen House;

b)    Bordwok would pay all closing costs, mortgage payments, interest payments, taxes, utilities, and all other costs with respect to the Damen House until it was sold; and

c)    Mr. Laughlin would sell the Damen House after the renovations were completed with all proceeds from the sale to be received by Bordwok.

Defendants further state that this agreement was similar to the agreements between Bordwok and other members with respect to other Bordwok projects.

21.    Once the conversion of the Damen building was complete, however, Lucas suggested to the Plaintiffs that, instead of selling the Damen building to a third–party, they could move in to the home and keep it for themselves.  Lucas reasoned that the home would not only be a suitable residence for the Plaintiffs and their family, it would stand as advertising to any future clients of Michael and Bordwok.  In addition, Bordwok would save the real estate agent fees, legal fees, and taxes that would be incurred in a third–party sale, and Bordwok would have a quick and risk–free sale of its first Chicago property.

**ANSWER:**    Defendants admit that Mr. Lucas suggested that if the Laughlins wanted to move into the Damen House and keep it for themselves that the Laughlins re-finance the Damen

House and pay to Bordwok consideration equal to $200,000.00 plus all of the amounts expended by Bordwok with respect to the Damen House.  Mr. Lucas told Mr. Laughlin on numerous occasions orally and in writing that the Laughlins were not to move into the Damen House unless and until they had secured the appropriate re-financing so that they could compensate Bordwok as agreed.  Defendants deny the remaining allegations in paragraph 21.

22.    Once the conversion of the Damen building was complete, however, Lucas suggested to the Plaintiffs that, instead of selling the Damen building to a third–party, they could move in to the home and keep it for themselves.  Lucas reasoned that the home would not only be a suitable residence for the Plaintiffs and their family, it would stand as advertising to any future clients of Michael and Bordwok.  In addition, Bordwok would save the real estate agent fees, legal fees, and taxes that would be incurred in a third–party sale, and Bordwok would have a quick and risk–free sale of its first Chicago property.

**ANSWER:**    Defendants deny the allegations in paragraph 22.

23.    In addition, Lucas further promised to increase Michael's monthly advance of his share of future profits from $5,500 to $10,500 per month so the Plaintiffs could obtain financing and cover the increased costs of the mortgage on the Damen building relative to the Plaintiffs' previous residence.  Lucas and Michael agreed that the new amount would either be paid directly to Michael by Bordwok, or it would be paid via Bordwok continuing to make the mortgage payments on the property.

**ANSWER;**    Defendants deny the allegations in paragraph 23.

24.    Lucas realized that a quick sale of the Damen building would avoid the uncertainty of having the house on the market for a long period of time, and would also provide Bordwok with some needed cash.  Lucas also realized that the Damen building likely had a few

hundred thousand dollars of equity in it that could be leveraged and paid to Bordwok as part of a sale by the new owners.

**ANSWER:**    Defendants admit the allegations in paragraph 24.

25.    Consequently, Lucas approached the Plaintiffs in the Summer of 2007 with the idea that they be the ones to purchase the house.  He told them that it would be advantageous for them and Bordwok because money could be saved in realtor, legal, and tax fees in such a transaction, as the Plaintiffs already legally owned the house.

**ANSWER:**    Defendants admit that Mr. Laughlin told Mr. Lucas that Mr. and Ms. Laughlin liked the Damen House and admit that Mr. Laughlin and Mr. Lucas discussed the possibility of the Laughlins moving into the Damen House if Bordwok was properly compensated as agreed.  Defendants admit that Mr. Laughlin and Mr. Lucas discussed possible advantages that could be realized by Bordwok and the Laughlins as a result of the Laughlins moving into the Damen House.  Defendants deny the remaining allegations in paragraph 25.

26.    Lucas arranged an appraisal on the home and set up preliminary financing for the Plaintiffs whereby they would give up most of the equity in the home in return for a mortgage that covered nearly the entire purchase price of $1.2 million.  The equity in the home -- approximately $200,000 -- would then be realized Bordwok, while the Plaintiffs would be taking over an expensive loan on a house with little to no equity.

**ANSWER;**    Defendants deny the allegations in paragraph 26.

27.    In the Summer of 2007, Lucas insisted that the Plaintiffs move in to the house.  In order for them to qualify for the financing he had arranged and to cover the higher mortgage payments the Plaintiffs would have to make on the Damen building, Lucas, on his own behalf and behalf of Bordwok, promised that Bordwok would increase its monthly advance profit draw to Michael to $10,500.

**ANSWER:**    Defendants deny the allegations in paragraph 27.

28.    In fact, Lucas' promise to the Plaintiffs was false, and Lucas never intended to honor it. The false promise to increase Michael's monthly advance profit draw if he moved into the house and agreed to the deal was instead made by Lucas as part of a fraudulent scheme to induce the Plaintiffs to put themselves in a vulnerable position in regard to their home so that Bordwok could either realize the $200,000 profit on the sale and discontinue making monthly draw payments to Michael after closing, or Bordwok could later demand more money from the Plaintiffs to acquire the house should the financing fall through.

**ANSWER;**    Defendants deny the allegations in paragraph 28.

29.    In reliance on the representations of Lucas and the promises made between the parties, the Plaintiffs rented their old house and moved into the Damen building in October 2007.

**ANSWER:**    Defendants deny the allegations in paragraph 29.

30.    Recently, however, Lucas and Bordwok have dishonored the promises they made to the Plaintiffs for the purchase of the Damen building. Specifically, Lucas has repudiated his agreement to let the Plaintiffs take full and unrestricted ownership of the building based upon a $1.2 million sales price. Instead, Lucas has demanded immediate payment from the Plaintiffs of $300,000 to $350,000, without even a promise to give up Bordwok's rights in the property in return.

**ANSWER:**    Defendants deny the allegations in paragraph 30.

31.    On February 26, 2008, the Plaintiffs received a letter from Bordwok's counsel indicating that Bordwok believes that it has no current agreement with the Plaintiffs pertaining to the Damen building, that it never agreed to allow the Plaintiffs to live there, and that the Plaintiffs must immediately pay to Bordwok the amount of $300,000.

**ANSWER:**   Defendants admit that their counsel sent a letter to the Laughlins indicating that no agreement had been reached permitting the Laughlins to move into the Damen House and requesting that the Laughlins properly reimburse Bordwok in light of the fact that the Laughlins were treating a Bordwok project as their personal residence.

32.     In addition, in further contrivance of the Defendants' promises, Bordwok ceased making the mortgage payments on the Damen Building, and discontinued paying Michael any of the monthly advances on Michael's share of future profits.

**ANSWER;**   Defendants do not understand the allegation that they have taken action "in further contrivance" of alleged promises.  Defendants admit that Bordwok is not making the monthly mortgage payment for a house that the Laughlins are using as a personal residence and deny that Bordwok has any obligation to do so.  Defendants deny the remaining allegations in paragraph 32.

### Bordwok's refusal to pay Michael profits on Chicago Projects

33.     To date, Michael has acquired and managed two residential construction projects for Bordwok, wherein Bordwok earned approximately $50,000 in revenue.

**ANSWER;**   Defendants admit that Mr. Laughlin has managed two construction projects for Bordwok.  Defendants deny that Bordwok earned approximately $50,000.00 in revenue as a result.

34.     Those projects were home renovation/remodeling projects wherein Michael performed all of the same construction management duties he performs on Bordwok's own projects.

**ANSWER:**   Defendants admit the allegations in paragraph 34.

35.     The fees paid for these projects were paid directly to Bordwok; i.e., Michael did not retain any of these fees.

**ANSWER;**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.

36.    Despite Bordwok and Lucas' promise to split the profits of such work with Michael, Bordwok has failed to pay any amounts to Michael from those projects.

**ANSWER:**    Defendants deny that any agreement was ever reached with respect to a profit-based bonus or commission for Mr. Laughlin. Defendants further state that Bordwok has made multiple proposals to Mr. Laughlin with regard to his compensation, but Mr. Laughlin accepted none of them and made no counter-proposals.

37.    Moreover, Michael has, on behalf of Bordwok, acquired, managed, built, or renovated multiple projects in Chicago, including those at 2038 West Cullom, 4242 North Leavitt, 4028 North Oakley, and at State & Randolph.   He also obtained the mortgage and construction financing and personally guaranteed the loans on most of these properties.   While none of those properties have yet been sold to third–parties, some or all are currently listed or will soon be offered to sale to the public.  Based upon the proposed list prices of those properties, Michael expects that the sale of those properties will realize a collective gross profit of over $1,260,000.

**ANSWER:**    Bordwok admits that Mr. Laughlin has supervised Bordwok's construction activities in Chicago in the past and denies the remaining allegations in paragraph 37.

38.    In reliance on all of Lucas and Bordwok's promises to Michael, Michael has researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects.

**ANSWER:**    Bordwok admits that Mr. Laughlin has supervised Bordwok's construction activities in Chicago in the past and denies the remaining allegations in paragraph 38.

39.    Again, despite Lucas and Bordwok's promises to Michael, Lucas has flatly told Michael that Bordwok will not be sharing with Michael any percentage of the profits on any such job.

**ANSWER;**    Defendants deny that any agreement was ever reached with respect to a profit-based bonus or commission for Mr. Laughlin.  Defendants further state that Bordwok has made multiple proposals to Mr. Laughlin with regard to his compensation, but Mr. Laughlin accepted none of them and made no counter-proposals.

### Interference with Chicago Projects

40.    In addition to the refusal by Lucas and Bordwok with respect to the promised profits, the Defendants have begun to take other actions that threaten the progress of the Chicago construction and development project

**ANSWER:**    Defendants deny the allegations in paragraph 40.

41.    Luke Wilkins is a general foreman Michael hired to assist in managing the construction activities on Bordwok's various Chicago projects.  His salary is paid directly by Bordwok.  Wilkins' work is vital to the completion and ultimate profitability of the Chicago projects.

**ANSWER:**    Defendants admit that Mr. Laughlin hired Mr. Wilkins to assist in managing construction activities in Chicago and that Bordwok paid Mr. Wilkins a salary. Defendants deny the remaining allegations in paragraph 41.

42.    Recently, however, Bordwok has indicated that it will no longer pay Wilkins' salary, or at least until Michael agrees to Lucas and Bordwok's demand that he pay $300,000 on the Damen property.

**ANSWER:**    Defendants deny the allegations in paragraph 42.

43.    In addition, Michael and Bordwok had agreed that they would not hire an independent real estate agent to list the various Chicago development properties when they were ready for sale. Instead, the two agreed that Michael, who is a licensed real estate agent, would list and show the properties himself, so that they could save the expense of a real estate agent. Michael explicitly agreed not to take his entitled fee so that he and Bordwok could increase the overall profitability of the projects. This is consistent with Michael's actions on the Bordwok projects, as he decided to forego his fee on the Damen building purchase, too, to increase overall profits of the deal.

**ANSWER:**    Defendants deny the allegations in paragraph 43.

44.    In addition, Michael and Bordwok had agreed that they would not hire an independent real estate agent to list the various Chicago development properties when they were ready for sale. Instead, the two agreed that Michael, who is a licensed real estate agent, would list and show the properties himself, so that they could save the expense of a real estate agent. Michael explicitly agreed not to take his entitled fee so that he and Bordwok could increase the overall profitability of the projects. This is consistent with Michael's actions on the Bordwok projects, as he decided to forego his fee on the Damen building purchase, too, to increase overall profits of the deal.

**ANSWER:**    Defendants deny that there was ever any agreement that Bordwok would not hire an independent real estate agent and admit that Bordwok has hired an independent real estate agent to list and sell the Cullom and Leavitt properties. Defendants deny the remaining allegations in paragraph 44.

45.    In addition, at Lucas and Bordwok's direction, Michael obtained a credit card that is in Bordwok's name, but is also personally guaranteed by Michael. Michael used the credit card for construction–related expenses, and the bill has always been paid by Bordwok.

**ANSWER:**    Defendants admit that Mr. Laughlin obtained a credit card in Bordwok's name that was personally guaranteed by Mr. Laughlin.    Bordwok is without knowledge or information sufficient to admit or deny the allegation that Mr. Laughlin used the credit card for "construction-related expenses."  Bordwok admits that it paid the credit card bill.

46.    Recently, however, Bordwok has told Michael that it will no longer pay that credit card bill, and it has, in fact, stopped paying it.

**ANSWER:**    Defendants deny the allegations in paragraph 46.

47.    Bordwok's refusal to pay the credit card bill not only jeopardizes Michael's credit rating and exposes him to personal liability for corporate debts, it has hampered the progress of the Chicago projects, as Michael can no longer buy incidental items for those projects.

**ANSWER:**    Defendants deny the allegations in paragraph 47.

### The Florida Condominium

48.    At Lucas' suggestion and urging, the Plaintiffs acquired and financed a condominium in Sarasota, Florida in a residential development known as "Vintage Grand."

**ANSWER:**    Defendants admit that Plaintiffs acquired and financed a condominium in Sarasota, Florida known as Vintage Grand and deny the remaining allegations in paragraph 48.

49.    The Vintage Grand property was originally titled in the names of the Plaintiffs and Lucas, but Lucas subsequently removed his own name from the property's title, ostensibly so he could free himself up to purchase another property.  The property is therefore now titled in the Plaintiffs' names only, and the Plaintiffs are the mortgagors on the property.  The mortgage loan balance is currently approximately $137,000.

**ANSWER:**    Defendants admit that Vintage Grand was originally titled in the name of Mr. Lucas and Plaintiffs and now is titled in the name of Plaintiffs.  Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 49.

50.    The Plaintiffs acquired the property at the request and direction of Lucas and Bordwok. The intention of the acquisition was to derive rental income from the property in the short term, and ultimately to re–sell the property at a profit. All profits realized on the property were to be split between the Plaintiffs and Bordwok.

**ANSWER:**    Defendants deny the allegations in paragraph 50.

51.    The Plaintiffs acquired the property at the request and direction of Lucas and Bordwok. The intention of the acquisition was to derive rental income from the property in the short term, and ultimately to re–sell the property at a profit. All profits realized on the property were to be split between the Plaintiffs and Bordwok.

**ANSWER:**    Defendants admit that Mr. Laughlin and Mr. Lucas agreed to obtain credit lines on the Florida property to provide working capital to Bordwok and deny the remaining allegations in paragraph 51.

52.    Lucas' name, too, was originally on the title of the Vintage Grand property. Prior to directing the Plaintiffs to take out the additional $105,000 line of credit, however, Lucas convinced the Plaintiffs to allow him to take his name off the property's title, ostensibly so he could purchase some other property himself.

**ANSWER:**    Defendants admit that Mr. Lucas's name was originally on the title of the Vintage Grand property and deny the remaining allegations in paragraph 52.

53.    Recently, however, Lucas and Bordwok have indicated to Michael that Bordwok is not be willing to continue paying the mortgage and line of credit associated with the Vintage Grand property, but instead prefers to allow the loans to be foreclosed upon. Such a foreclosure, of course, would aversely affect Plaintiffs' credit ratings and would expose them to liability for

any deficiencies between the amounts borrowed and the sale price of the property, as the property and its loans are not in Bordwok's name, but in the Plaintiffs' names.

**ANSWER:**     Defendants deny the allegations in paragraph 53.

54.     In addition, despite Bordwok's recent assurances that it will continue to pay the loans associated with the Vintage Grand property, it has in fact failed to do so, even going so far as to cancel at least one payment check it had recently submitted to the lender for one of the property's loans.

**ANSWER:**     Defendants deny the allegations in paragraph 54.

55.     Moreover, Bordwok has—without notice to the Plaintiffs or their consent— transferred the property's utilities and insurance to the Plaintiffs' names and address.

**ANSWER:**     Defendants admit the allegations in paragraph 55.

56.     Finally, despite repeated requests by Michael, Lucas and Bordwok have refused to provide any explanation or accounting to the Plaintiffs regarding the amount of rental income that has been generated by the property, or regarding the whereabouts of the $105,000 the Plaintiffs provided to Bordwok.

**ANSWER:**     Defendants deny the allegations in paragraph 56.

**Lucas and Bordwok's Defamatory Statements**

57.     Recently, Michael has come under increasing mistreatment by Lucas and Bordwok.

**ANSWER:**     Defendants deny the allegations in paragraph 57.

58.     On multiple occasions in the past several months, Lucas, on his own behalf and on behalf of Bordwok, has made defamatory, disparaging, and untrue statements regarding Michael and Michael's ability to do his job.

**ANSWER:**     Defendants deny the allegations in paragraph 58.

59.   By way of example, Lucas made the following statements on the following occasions:

- On December 10, 2007, on a conference call with Rob Gavin, Chris Mitchell, Mike Laughlin, Jason Blair, Lucas falsely represented that Michael was unorganized, irresponsible, and incompetent, that the company could not move on to fund other projects because $1 million of Bordwok's money was tied up in Chicago due to Michael's poor performance, and he told the others that Bordwok cannot account for every penny of Bordwok's money that Michael has spent.

- On February 20, 2008, Lucas sent an e-mail message to Chris Mitchell, Rob Gavin, Luke Wilkins, and Jerry Lucas wherein he implied that Michael had mishandled the company's finances.

- On February 7, 2008, Lucas made a telephone call to Jason Blair and Luke Wilkins wherein he falsely claimed that Michael was jeopardizing the company's future by failing to turn over the Damen building.

- On repeated occasions, Lucas called Chris Mitchell and falsely told him, among other things, that Michael is incompetent, doing a bad job, is holding up further Boardwalk ventures, and is responsible for Bordwok being unable to launch the planned Bordwok Mortgage venture.

**ANSWER:**   Defendants deny that Mr. Lucas made the statements alleged to have been made on December 10, 2007.  Defendants admit that Mr. Lucas sent an email on February 20, 2008, but deny that he implied that Mr. Laughlin had mishandled company finances in that email.  Defendants deny that Mr. Lucas made the statements alleged to have been made on February 7, 2008.  Defendants deny that Mr. Lucas called Chris Mitchell and told him that Mr. Laughlin was incompetent, doing a bad job, holding up further Bordwok ventures, and responsible for Bordwok being unable to launch the planned Bordwok Mortgage venture.

### Michaels' demand for financial information from Bordwok

60.   Due in part to Lucas' increasingly hostile attitude toward Michael, Michael began to have serious doubts about the fiscal health of Bordwok, of which Michael is an investor and a Member.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation as to Mr. Laughlin's alleged doubts and deny the remaining allegations in paragraph 60.

61.    In addition, Lucas has informed Michael that, while the Chicago properties owned by Bordwok are doing well financially, the Florida properties are not faring as well.  Upon information and belief, Bordwok's Florida properties are decreasing rapidly in value, and foreclosures may be imminent.

**ANSWER:**    Defendants deny the allegations in paragraph 61.

62.    Concerned about the finances of the company, Michael requested of Lucas complete access to Bordwok's books so that he could evaluate the value of his investment.  Such is Michael's right pursuant to 16.1 of Bordwok's Amended and Restated Operating Agreement.

**ANSWER:**    Defendants admit that Mr. Laughlin's attorney requested access to certain company records after Plaintiffs filed this lawsuit and deny the remaining allegations in paragraph 62.

63.    Section 16.1 of the Operating Agreement provides in part that, "Any Member or such member's duly authorized representative, subject to reasonable standards established by the General Manager governing what information and documents are to be furnished at what time and location and at whose expense, shall have the right at any time, for any purpose reasonably related to such member's Unit, to inspect and copy from such books and documents during normal business hours." Lucas and Bordwok, however, have steadfastly refused Michael as well as other Bordwok investors any such access.

**ANSWER:**    Defendants admit the allegations in paragraph 63.

64.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re–alleges them for this paragraph of Count I of the Complaint as though fully set forth herein.

**ANSWER:**   Defendants admit that Mr. Laughlin has not been provided access to company books and records and deny the remaining allegation in paragraph 64.

**COUNT I**
**(Michael v. Defendants -- Defamation per se)**

65.   Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re–alleges them for this paragraph of Count I of the Complaint as though fully set forth herein.

**ANSWER:**   The allegations of this paragraph are part of a count that is subject to a pending motion to dismiss by Defendants.

66.   The false statements about Michael made by Lucas were made on his own behalf and on behalf of Bordwok.

**ANSWER:**   The allegations of this paragraph are part of a count that is subject to a pending motion to dismiss by Defendants.

67.   The statements made by Lucas impugned Michael's professional integrity, imputed an inability to perform or a lack of integrity in the discharge of his duties at Bordwok, and imputed a lack of ability on his part in his trade.

**ANSWER:**   The allegations of this paragraph are part of a count that is subject to a pending motion to dismiss by Defendants.

68.   The statements constitute Defamation per se under the law, and, as such, no damages need be proven for them to be actionable.  Regardless, the statements were intended to and did in fact cause harm to Michael's reputation and standing among others in the community. As a result, Michael has suffered pecuniary damages.

**ANSWER:**   The allegations of this paragraph are part of a count that is subject to a pending motion to dismiss by Defendants.

## COUNT II

### (Plaintiffs v. Bordwok – Breach of Contract – Damen Building)

69.     The Plaintiffs incorporate paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count II of the Complaint as though fully set forth herein.

**ANSWER:**   Defendants incorporate by reference their responses to paragraphs 1 through 68.

70.     The Plaintiffs and Bordwok entered a valid and enforceable contract in regard to the Damen building.  The Plaintiffs promised to pay to Bordwok the gross profits of the Damen Building based upon an assumed $1.2 million sale price, and Bordwok promised in return to transfer to the Plaintiffs any rights it has in the building, as well as to make the transaction possible by increasing Michael's monthly advance profits payment.

**ANSWER:**   Defendants deny the allegations in paragraph 70.

71.     The Plaintiffs have completed, or stand willing to complete, all conditions required of them under the contract.

**ANSWER:**   Defendants deny the allegations in paragraph 71.

72.     Bordwok, however, has breached that contract by ceasing to make mortgage payments on the property, ceasing to make Michael's increased advances on his share of the profits, by demanding additional compensation that was not agreed to, and by insisting that no such agreement ever existed between the parties.

**ANSWER:**   Defendants deny the allegations in paragraph 72.

73.     The Plaintiffs have been damaged and will continue to be damaged by Bordwok's breach of the contract.

**ANSWER:**   Defendants deny the allegations in paragraph 73.

21

## COUNT III

### (Plaintiffs v. Bordwok – Promissory Estoppel – Damen Building)

74.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count III of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 73.

75.    This Count is pled in the alternative. The facts alleged in this Count are alleged without prejudice to any other allegations made in the Plaintiffs' Complaint.

**ANSWER:**    Paragraph 75 contains no factual allegations to which a response is required.

76.    Bordwok, via Lucas, promised the Plaintiffs that if they moved into the Damen Building and paid to Bordwok the gross profits of the Damen Building based upon an assumed $1.2 million sale price, Bordwok would transfer to the Plaintiffs any rights it has in the building, and would make the transaction possible by increasing Michael's monthly advance profits payment.

**ANSWER:**    Defendants deny the allegations in paragraph 76.

77.    The Plaintiffs reasonably relied on Bordwok's promise, and they vacated their old house, moved into the new house, and arranged for financing for the new house.

**ANSWER:**    Defendants admit that Plaintiffs moved into the Damen House and deny the remaining allegations in paragraph 77.

78.    The Plaintiffs' reliance on Bordwok's promise was expected and foreseeable by Bordwok.

**ANSWER:**    Defendants deny the allegations in paragraph 78.

79.    The Plaintiffs' reliance on Bordwok's promise, however, was to their detriment, as Bordwok's refusal to fulfill its promise has left Plaintiffs in a new house that they cannot afford and are in danger of losing.  The Plaintiffs have suffered pecuniary damages as a direct result of Bordwok's actions.

**ANSWER:**    Defendants deny the allegations in paragraph 79.

## COUNT IV

### (Michael v. Bordwok – Breach of Contract – Failure to split profits)

80.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re-alleges them for this paragraph of Count IV of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 79.

81.    Michael and Bordwok entered into a valid and enforceable contract in regard to his compensation for work performed on Bordwok's Chicago projects.  In return for Michael's work for Bordwok in acquiring, financing, and managing Bordwok's Chicago projects, Bordwok promised to compensate Michael by sharing with him the profits of those projects, both in the future when the profits are finally realized, as well as before that time via monthly advances.

**ANSWER:**    Defendants deny the allegations in paragraph 81.

82.    Michael has completed, or stands willing to complete, all conditions required of him by the parties' contract.

**ANSWER:**    Defendants deny the allegations in paragraph 82.

83.    Bordwok, however, has breached that contract by failing to pay Michael the advances on his share of profits owed to him, by refusing to pay all future shares owed to him, and by denying that any agreement ever existed to split profits with him.

**ANSWER:**    Defendants deny the allegations in paragraph 83.

23

84.    As a direct and proximate result of Bordwok's breach, Michael has been damaged in an amount equaling at least $680,000.

**ANSWER:**    Defendants deny the allegations in paragraph 84.

## COUNT V

### (Michael v. Bordwok – Quantum Meruit – Failure to split profits)

85.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re-alleges them for this paragraph of Count V of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 84.

86.    This Count is pled in the alternative.  The facts alleged in this Count are alleged without prejudice to any other allegations made in the Plaintiffs' Complaint.

**ANSWER:**    Paragraph 86 contains no factual allegations to which a response is required.

87.    Since the Spring of 2006, Michael has preformed extensive work on behalf of Bordwok, which included researching, finding, negotiating, acquiring, financing, managing, and financially guaranteeing Bordwok's Chicago projects.

**ANSWER:**    Defendants admit that Mr. Laughlin worked for Bordwok and deny the remaining allegations in paragraph 87.  Defendants further state that Mr. Laughlin was properly compensated for all work performed for Bordwok.

88.    Michael performed the work based on Lucas' promise that he would be compensated by Bordwok by splitting with it the ultimate profits derived from the project, both in the future and in the form of monthly advance payments.

**ANSWER:**    Defendants deny the allegations in paragraph 88.

89.    It was Michael's expectation that his share would be 50% of the total profits earned on the Bordwok development projects and 80% on the fee-based construction projects

24

acquired and managed by Michael, which would be a fair return given the breadth and scope of Michael's work and investment dedicated to the projects.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations as to Mr. Laughlin's alleged "expectations." Defendants deny the remaining allegations in paragraph 89.

90.    Michael's efforts have conferred a benefit upon Bordwok, insofar as Bordwok now stands ready to realize profits on the sale of the various properties in Chicago upon which Michael has worked.

**ANSWER:**    Defendants deny the allegations in paragraph 90.

91.    Bordwok, however, has stopped paying Michael the advances on the projects' profits that it was previously paying to him, and has further informed Michael that it will not be sharing with him in the future any of the profits ultimately realized from the Chicago projects.

**ANSWER:**    Defendants admit that Bordwok is not paying any "advances" or "profits" to Mr. Laughlin and deny that it has any obligation to do so.

92.    Bordwok's retention of the benefits of Michael's work without further payment is unjust, as Michael researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects in return for the promised share of the projects' profits. Moreover, Bordwok knew throughout the time that Michael was performing his services on the Chicago projects that he was working under the expectation that he would be so compensated.

**ANSWER:**    Defendants deny the allegations in paragraph 92.

93.    As a direct and proximate result of Bordwok's unjust retention of the compensation owed to him, Michael has been damaged in an amount equaling at least $680,000.

**ANSWER:**    Defendants deny the allegations in paragraph 93.

## COUNT VI

### (Plaintiffs v. Bordwok – Breach of Contract – Vintage Grand)

94.      The Plaintiffs incorporate paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count VI of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 93.

95.      The Plaintiffs and Bordwok entered a valid and enforceable contract in regard to the Vintage Grand property.    At Lucas' insistence, the Plaintiffs personally acquired and financed the property, obtained a $105,000 loan secured by the property the proceeds of which they provided to Bordwok, and they allowed Bordwok to manage the property and derive and retain all rental income earned from the property.    In return, Bordwok promised to make all loan payments, cover all operating costs on the property, and split with the Plaintiffs any profits realized from the sale of the property.

**ANSWER:**    Defendants deny the allegations in paragraph 95.

96.      The Plaintiffs have completed all conditions required of them under the contract.

**ANSWER:**    Defendants deny the allegations in paragraph 96.

97.      Bordwok, however, has breached that contract by ceasing to make loan payments on the property and payments of the operating costs.

**ANSWER:**    Defendants deny the allegations in paragraph 97.

98.      The Plaintiffs have been damaged and will continue to be damaged by Bordwok's breach of the contract.

**ANSWER:**    Defendants deny the allegations in paragraph 98.

## COUNT VII

### (Plaintiffs v. Bordwok – Promissory Estoppel – Vintage Grand)

99.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count VII of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 98.

100.    This Count is pled in the alternative.  The facts alleged in this Count are alleged without prejudice to any other allegations made in the Plaintiffs' Complaint.

**ANSWER:**    Paragraph 100 contains no factual allegations to which a response is required.

101.    Bordwok, via Lucas, promised the Plaintiffs that if they acquired and financed the Vintage Grand property, obtained a $105,000 loan secured by the property and conveyed the proceeds to Bordwok, and they allowed Bordwok to manage the property and derive and retain all rental income earned from the property, Bordwok would make all loan payments, cover all operating costs on the property, and split with the Plaintiffs any profits realized from the sale of the property.

**ANSWER:**    Defendants deny the allegations in paragraph 101.

102.    The Plaintiffs reasonably relied on Bordwok's promise, and took all of the actions Lucas requested of them.

**ANSWER:**    Defendants deny the allegations in paragraph 102.

103.    The Plaintiffs' reliance on Bordwok's promise was expected and foreseeable by Bordwok.

**ANSWER:**    Defendants deny the allegations in paragraph 103.

104.    The Plaintiffs' reliance on Bordwok's promise, however, was to their detriment, as Bordwok's refusal to fulfill its promise has left Plaintiffs responsible for all costs associated with the Vintage Grand property, and the risk of a personal default on their credit rating.  The Plaintiffs have suffered pecuniary damages as a direct result of Bordwok's actions.

**ANSWER:**    Defendants deny the allegations in paragraph 104.

## COUNT VIII

### (Plaintiffs v. Defendants – Fraud – Vintage Grand)

105.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count VIII of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 104.

106.    Lucas, on his own behalf and on behalf of Bordwok, made the following promises to the Plaintiffs:

- In January 2005, Lucas promised the Plaintiffs that Bordwok would make all mortgage payments on the Vintage Grand property;

- In January 2005, Lucas promised that Bordwok would pay all operating costs on the property, including utilities, taxes, condo association fees, and insurance;

- In January 2005, Lucas promised that Bordwok would split with the Plaintiffs the profits realized by an eventual sale of the property; and

- In May 2006, after Lucas convinced the Plaintiffs to allow him to remove his name from the property's title, Lucas promised that Bordwok would make all payments (including principal and interest) on outstanding amounts on the line of credit secured by the property.

- In May 2006, after Lucas convinced the Plaintiffs to allow him to remove his name from the property's title, Lucas promised that Bordwok would make all payments (including principal and interest) on outstanding amounts on the line of credit secured by the property, even though he was no longer on the title of the property

**ANSWER:**    Defendants deny the allegations in paragraph 106.

107.    All of the promises made by Lucas to the Plaintiffs were false, and Lucas never intended to honor them.  The false promises were instead made by Lucas as part of a fraudulent scheme to induce the Plaintiffs to invest their money and credit in the Vintage Grand property as well as to induce them to pay the entire proceeds of the line of credit directly to Bordwok, which Lucas accomplished after he convinced the Plaintiffs to allow him to remove his own name from the property's title.  Lucas made the false promises with the intention that the Plaintiffs would rely on his promises and make the expected investments and payments.

**ANSWER:**    Defendants deny the allegations in paragraph 107.

108.    The Plaintiffs reasonably relied on Lucas' fraudulent promises when they acquired and financed the Vintage Grand property in their own names, when they obtained a line of credit secured by the property and paid the entire $105,000 to Bordwok, and when they allowed Bordwok to retain all rental income derived from the property.  As a proximate result of Lucas' false promises and the Plaintiffs' reasonable reliance on them, the Plaintiffs have suffered pecuniary damages.  Bordwok has ceased making loan payments on the property and has also stopped paying the property's operating costs, as well.  The Plaintiffs now must shoulder all of those costs, as well as the loss of all rental income from the property and the $105,000 they paid to Bordwok from the line of credit, which was provided to Bordwok only after Lucas removed himself from the property's title.

**ANSWER:**    Defendants deny the allegations in paragraph 108.

109.    As a proximate result of Lucas' false promises and the Plaintiffs' reasonable reliance on them, the Plaintiffs have suffered pecuniary damages.  Bordwok has ceased making loan payments on the property and has also stopped paying the property's operating costs, as well.  The Plaintiffs now must shoulder all of those costs, as well as the loss of all rental income

from the property and the $105,000 they paid to Bordwok from the line of credit, which was provided to Bordwok only after Lucas removed himself from the property's title.

**ANSWER:**    Defendants deny the allegations in paragraph 109.

## COUNT IX

### (Plaintiffs v. Defendants – Fraud – Damen House)

110.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint and re–allege them for this paragraph of Count IX of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 109.

111.    In the Summer of 2007, Lucas realized that a quick sale of the Damen building would avoid the uncertainty of having the house on the market for a long period of time, and would also provide Bordwok with some needed cash.    Lucas also realized that the Damen building likely had a few hundred thousand dollars of equity in it that could be leveraged and paid to Bordwok as part of a sale by the new owners.

**ANSWER:**    Defendants admit the allegations in paragraph 111.

112.    Consequently, Lucas approached the Plaintiffs in the Summer of 2007 with the idea that they be the ones to purchase the house. He told them that it would be advantageous for them and Bordwok because money could be saved in realtor, legal, and tax fees in such a transaction, as the Plaintiffs already legally owned the house.

**ANSWER:**    Defendants admit that Mr. Laughlin told Mr. Lucas that Mr. and Ms. Laughlin liked the Damen House and admit that Mr. Laughlin and Mr. Lucas discussed the possibility of the Laughlins moving into the Damen House if and only if the Laughlins paid to Bordwok consideration equal to $200,000.00 plus all amounts expended by Bordwok on the Damen House.    Defendants admit that Mr. Laughlin and Mr. Lucas discussed possible

advantages that could be realized by Bordwok and the Laughlins as a result of the Laughlins moving into the Damen House. Defendants deny the remaining allegations in paragraph 112.

113.    Lucas arranged an appraisal on the home and set up preliminary financing for the Plaintiffs whereby they would give up most of the equity in the home in return for a mortgage that covered nearly the entire purchase price of $1.2 million. The equity in the home— approximately $200,000—would then be realized Bordwok, while the Plaintiffs would be taking over an expensive loan on a house with little to no equity.

**ANSWER:**    Defendants deny the allegations in paragraph 113.

114.    In the Summer of 2007, Lucas insisted that the Plaintiffs move in to the house. In order for them to qualify for the financing he had arranged and to cover the higher mortgage payments the Plaintiffs would have to make on the Damen building, Lucas, on his own behalf and behalf of Bordwok, promised that Bordwok would increase its monthly advance profit draw to Michael to $10,500.

**ANSWER:**    Defendants deny the allegations in paragraph 114.

115.    In fact, Lucas' promise to the Plaintiffs was false, and Lucas never intended to honor it. The false promise to increase Michael's monthly advance profit draw if he moved into the house and agreed to the deal was instead made by Lucas as part of a fraudulent scheme to induce the Plaintiffs to put themselves in a vulnerable position in regard to their home so that Bordwok could either realize the $200,000 profit on the sale and discontinue making monthly draw payments to Michael after closing, or Bordwok could later demand more money from the Plaintiffs to acquire the house should the financing fall through.

**ANSWER:**    Defendants deny the allegations in paragraph 115.

116.    Lucas made the false promise with the intention that the Plaintiffs would rely on his promise.

31

**ANSWER:**   Defendants deny the allegations in paragraph 116.

117.   The Plaintiffs reasonably relied on Lucas' fraudulent promise when they rented and moved out of their old house, when they moved into the Damen building, and when they obtained financing for the Damen building.

**ANSWER:**   Defendants deny the allegations in paragraph 117.

118.   As a proximate result of Lucas' false promise and the Plaintiffs' reasonable reliance on it, the Plaintiffs have suffered pecuniary damages.  Bordwok has ceased making mortgage payments on the Damen building, has stopped paying Michael's advance profit draws, and has demanded additional money from the Plaintiffs to allow them to stay in the house.

**ANSWER:**   Defendants deny the allegations in paragraph 118.

119.   Michael incorporates by reference paragraphs 1 through 64 of this Complaint and re–alleges them for this paragraph of Count X of the Complaint as though fully set forth herein.

**ANSWER:**   Defendants incorporate their responses to paragraphs 1 through 118.

120.   In November 2005 at or near the time Michael made his presentation to the Bordwok investors, and then again in Spring of 2006 when Michael left his prior job to manage Bordwok's Chicago operations full time, Lucas, on his own behalf and on behalf of Bordwok, promised Michael that, if he would perform the full time work required to acquire, develop, finance, and construct the Chicago properties, Michael would split with Bordwok the profits from the eventual sale of the properties.

**ANSWER:**   Defendants deny the allegations in paragraph 120.

121.   Michael reasonably relied on these promises when he decided to go to work with Bordwok, and when he researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects.

**ANSWER:**    Defendants deny the allegations in paragraph 121.

122.    Subsequently, in late 2006 and into 2007, Lucas continued to make those same promises to Michael that he would ultimately be compensated for his work by splitting profits with Bordwok. Michael reasonably relied on those promises, too, when he decided to continue to research properties for Bordwok, negotiate their sale, obtain mortgage and construction financing for them, personally guarantee the loans, hire contractors, and manage the construction of the projects.

**ANSWER:**    Defendants deny the allegations in paragraph 122.

123.    All of the promises made by Lucas to Michael regarding splitting the profits were false, however, and Lucas never intended to honor them. The false promises were instead made by Lucas as part of a fraudulent scheme to induce Michael to work and to continue to work on Bordwok's behalf; to wit, researching properties for Bordwok, negotiating their sale, obtaining mortgage and construction financing for them, personally guaranteeing the loans, hiring contractors, and managing the construction of the projects.

**ANSWER:**    Defendants deny the allegations in paragraph 123.

124.    Lucas made the false promises with the intention that the Michael would rely on his promises and make the expected and anticipated investment in time and money toward the properties, and become financially committed to each property.

**ANSWER:**    Defendants deny the allegations in paragraph 124.

125.    Michael reasonably relied on Lucas' fraudulent promises when he went to work managing Bordwok's Chicago operations, and in deciding to continue that work, when he researched properties for Bordwok, negotiated their sale, obtained mortgage and construction financing for them, personally guaranteed the loans, hired contractors, and managed the construction of the projects—promise after promise, property after property.

**ANSWER:**    Defendants deny the allegations in paragraph 125.

126.    As a proximate result of Lucas' false promises and Michael's reasonable reliance on them, Michael has suffered pecuniary damages. Bordwok has ceased making advance profit draw payments to Michael, and Lucas has flatly told Michael that Bordwok will not be splitting any profits with him. Michael's pecuniary damages total in excess of $680,000.

**ANSWER:**    Defendants deny the allegations in paragraph 126.

## COUNT XI

### (Plaintiffs v. Defendants – Breach of Fiduciary Duty)

127.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint, as well as all paragraphs of Counts IV and VI, and re–allege them for this paragraph of Count XI of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 126.

128.    Bordwok and Michael entered a valid agreement to acquire, develop, and sell the Chicago properties and split the profits from the sales of those properties. Bordwok also entered a valid agreement with the Plaintiffs to acquire and sell the Vintage Grand property and split the profits.

**ANSWER:**    Defendants deny the allegations in paragraph 128.

129.    Bordwok and Michael are therefore joint adventurers in regard to the Chicago projects, and Bordwok and the Plaintiffs are joint adventurers in regard to the Vintage Grand property.

**ANSWER:**    Defendants deny the allegations in paragraph 129.

130.    Bordwok therefore owes to the Plaintiffs fiduciary duties of good faith and fair dealing, among others, especially in light of the unbalanced and unequal position of the parties.

**ANSWER:**    Defendants deny the allegations in paragraph 130.

131.    Bordwok, however, has breached that duty to Michael in regard to the Chicago projects by refusing to pay him his share of the profits realized from the Chicago projects, and instead channeling the money to its own selfish uses.

**ANSWER:**    Defendants deny the allegations in paragraph 131.

132.    Moreover, Bordwok has breached its duty to the Plaintiffs in regard to the Vintage Grand property by ceasing to make the loan payments and misappropriating the $105,000 that the Plaintiffs provided to Bordwok.

**ANSWER:**    Defendants deny the allegations in paragraph 132.

133.    Bordwok's breaches have been effected and executed by, among others, Lucas.

**ANSWER:**    Defendants deny the allegations in paragraph 133.

134.    The Plaintiffs have been damaged and will continue to be damaged by Bordwok's breach of their fiduciary duties.

**ANSWER:**    Defendants deny the allegations in paragraph 134.

## COUNT XII

### (Plaintiffs v. Defendants – Accounting)

135.    The Plaintiffs incorporate by reference paragraphs 1 through 64 of this Complaint, as well as all of the allegations contained in Counts VIII, IX, X, and XI, and re–allege them for this paragraph of Count XII of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 134.

136.    In light of the fraudulent actions and breaches of fiduciary duties, detailed herein as well as Lucas' repeated refusals to Michael's requests for financial records access, the Plaintiffs require access to all of Bordwok's financial and business records, as well as that of its related LLC's, so that they may learn whether their misappropriated funds still exist, or where

they have gone, as well as where their investment dollars have gone or whether they even still exist

**ANSWER:**   Defendants deny the allegations in paragraph 136.

137.   Michael, as an investor, part owner, and Member of Bordwok, has requested this information pursuant to Section 16.1 of the Bordwok Operating Agreement, but he has been refused.

**ANSWER:**   Defendants deny the allegations in paragraph 137.

138.   Likewise, the Plaintiffs' demands for financial information related to Vintage Grand—including the whereabouts of the $105,000—have been denied.

**ANSWER:**   Defendants deny the allegations in paragraph 138.

139.   The Plaintiffs have a need for this information, but they have no adequate remedy at law to obtain it.

**ANSWER:**   Defendants deny the allegations in paragraph 139.

140.   Bordwok should therefore be compelled to make an Accounting to the Plaintiffs of all of Bordwok's financial and business information, including all of its subsidiaries, as soon as is practicable.

**ANSWER:**   Defendants deny the allegations in paragraph 140.

141.   In addition, the Bordwok should be compelled to make an Accounting to the Plaintiffs of all income and expenditure information related to Vintage Grand, as well as of the $105,000 the Plaintiffs provided to Bordwok that is secured by the Vintage Grand property.

**ANSWER:**   Defendants deny the allegations in paragraph 141.

142.   Moreover, Lucas himself is the manager or chief executive of Bordwok and all of its related entities.   Consequently, he has all of the knowledge and information regarding the

substance of the information sought by the Plaintiffs, and is on information and belief in actual possession of the information.

**ANSWER:**    Defendants admit the allegations in paragraph 142.

## COUNT XIII

### (Michael v. Defendants – Constructive Trust)

143.    Michael incorporates by reference paragraphs 1 through 64 of this Complaint, as well as all of the allegations contained in Counts VIII, X and XI, and re–alleges them for this paragraph of Count XIII of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 142.

144.    In light of the Defendants' fraudulent actions and breaches of fiduciary duty in wrongly retaining the share of the profits that are clearly owed to Michael, the Court should not allow Bordwok to realize the full profits of the various projects outlined herein without paying those amounts to Michael.  Any such profits Bordwok receives that are owed to Michael are wrongfully in its hands.

**ANSWER:**    Defendants deny the allegations in paragraph 144.

145.    Moreover, as General Manager of all Bordwok entities and related limited liability companies, Lucas should be enjoined from disposing of or distributing any of the profits from those sales without making payment to Michael.

**ANSWER:**    Defendants deny the allegations in paragraph 145.

146.    Consequently, this Court should impose a constructive trust in favor of Michael and against Bordwok for all amounts (1) currently possessed by Bordwok but owed to Michael for his share of the profits on the multiple Bordwok projects in Chicago, including those at 2038 West Cullom, 4242 North Leavitt, 4028 North Oakley, and at State & Randolph, as well as the

profits realized on the fee-based renovation projects managed by Michael and (2) realized by Bordwok in the future from the sale of those properties.

**ANSWER:**    Defendants deny the allegations in paragraph 146.

## COUNT XIV

### (Plaintiffs v. Defendants – Declaratory Judgment)

147.    The Plaintiffs incorporate by reference all allegations in Counts I through XIII of this Complaint, and re-allege them for this paragraph of Count XIIV of the Complaint as though fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to paragraphs 1 through 146.

148.    A dispute has arisen between the Plaintiffs and the Defendants as to the parties' rights and interests in relation to one another.

**ANSWER:**    Defendants admit that Plaintiffs have made certain claims but deny that such claims have any basis or validity.

149.    An actual existing and bona fide controversy exists between the Plaintiffs and the Defendants that can be determined only by a declaratory judgment.

**ANSWER:**    Defendants deny the allegations in paragraph 149.

150.    Under Rule 57 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. § 2201–2202, this Court is vested with the power to declare the rights and liabilities of the parties hereto.

**ANSWER:**    Paragraph 150 contains no factual allegations to which a response is required.

All allegations, averments and prayers for relief in the Complaint that are not expressly admitted herein are denied.

ELEVENTH AFFIRMATIVE DEFENSE

To the extent that Plaintiffs have stated a claim for breach of contract, such claims are barred, in whole or in part, by lack of consideration.

TWELFTH AFFIRMATIVE DEFENSE

To the extent that Plaintiffs have stated a claim for breach of contract, such claims are barred by Plaintiffs' own breaches of those contracts.

THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by set-off and/or recoupment.

FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the statute of frauds.

FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs failed to plead fraud with particularity.

SIXTEENTH AFFIRMATIVE DEFENSE

Subject to and without waiver of the foregoing defenses and affirmative defenses, Defendants respond to the individually-numbered allegations of the Complaint as follows:

**COUNTERCLAIM**

Subject to and without waiver of the foregoing defenses, affirmative defenses and denials, Defendant/Plaintiff-in-Counterclaim Bordwok Enterprises, LLC ("Bordwok") asserts the following counterclaim against Plaintiffs/Defendants-in-Counterclaim Michael Laughlin ("Mr. Laughlin") and Nicole Laughlin ("Ms. Laughlin") (collectively referred to as the "Laughlins"):

**PARTIES**

1.     Bordwok is a Georgia Limited Liability Company with a principal place of business in Fulton County, Georgia.

2.     Mr. Laughlin and Ms. Laughlin are residents of Chicago, Illinois.

40

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District, and property that is the subject of the action is located in this District.

## BACKGROUND FACTS

4.      Bordwok engages in the business of real estate investment and development and owns and operates a number of other companies that engage in the business of real estate investment and development.

5.      Certain members of Bordwok purchase and finance pieces of real property.

6.      Bordwok enters into agreements with its members whereby Bordwok pays all closing costs, other costs, and debt service with respect to these purchases, and all profits are received by Bordwok.

7.      Further, pursuant to these agreements, Bordwok pays for the costs of renovating the pieces of real property purchased by its members and all other costs.

8.      Further, pursuant to these agreements, when the renovations are complete, the properties are sold and the profits are remitted to Bordwok.

9.      Bordwok has engaged in its real estate investment and development business in Chicago through Bordwok Development, LLC, as well as through other related entities.

10.     Bordwok is the sole member of Bordwok Development, LLC.

11.     Mr. Laughlin is a former Member and Manager of Bordwok.

12.     In or about January, 2006, Bordwok identified a piece of real property located at 4317 North Damen Avenue, Chicago, Illinois ("Damen House") for purchase and renovation.

13.    Pursuant to an agreement with Bordwok, Mr. Laughlin obtained financing for the purpose of converting the Damen House (a two-flat apartment) into a single-family residence. Pursuant to the agreement, Bordwok paid all closing costs for the purchase of the Damen House.

14.    Also, pursuant to this agreement, Bordwok paid the monthly mortgage taken out on the Damen House by Mr. Laughlin, as well as all other expenses associated with the Damen House, including all taxes, insurance, and utilities.

15.    Finally, pursuant to this agreement, Bordwok and Mr. Laughlin agreed that the Damen House would be sold following the completion of the renovations with all profits to go to Bordwok.

16.    Subsequent to the purchase of the Damen House, Mr. Laughlin discussed with Mr. Lucas the possibility of purchasing all rights to the Damen House from Bordwok so that he could use the Damen House as a residence for his family.

17.    Mr. Laughlin had numerous discussions with Bordwok regarding different potential agreements that would permit Mr. Laughlin to purchase the rights to the Damen House.

18.    Mr. Laughlin represented to Bordwok that he recognized that he could not assume residency in the Damen House without properly compensating Bordwok.

19.    Bordwok informed Mr. Laughlin that he and his family could move into the Damen House and use it as their personal residence only if Mr. Laughlin paid to Bordwok consideration equal to $200,000.00 plus all amounts that Bordwok invested with respect to debt service and other expenses associated with the renovation.

20.    Bordwok specifically informed Mr. Laughlin that he should not move into the Damen House unless and until he had obtained financing so that he could properly compensate Bordwok as the parties had discussed.

21.    Mr. Laughlin agreed to these terms.

22.    Mr. Laughlin and his family moved into the Damen House in approximately October, 2007 without having obtained financing as the parties had discussed.  Acting in good faith and in reliance on Mr. Laughlin's promises to compensate Bordwok, Bordwok paid the debt service costs on the Damen House through February, 2008.

23.    However, despite the fact that his family had moved into the Damen House and was treating it as their personal residence, Mr. Laughlin refused to compensate Bordwok for the lost profit or the amounts invested by Bordwok for debt service and other expenses associated with the renovation of the Damen House as agreed.

24.    Bordwok has paid approximately $105,000.00 in carrying costs for the Damen House and approximately $48,000.00 in expenses associated with the renovation.

25.    After Mr. Laughlin moved into the Damen House, Bordwok requested on numerous occasions that Mr. Laughlin enter into a written agreement with Bordwok to resolve the issues raised by Mr. Laughlin's unauthorized acts.

26.    Mr. Laughlin refused to accept any of the multiple proposals made by Bordwok, and began acting in an increasingly uncooperative and evasive manner towards Bordwok.

27.    Indeed, while still a Manager of Bordwok, Mr. Laughlin acted intentionally to harm Bordwok.

28.    For example, Mr. Laughlin usurped a corporate opportunity of Bordwok by moving into the Damen House and refusing to compensate Bordwok for the lost profit or lost expenses.

29.    Mr. Laughlin also disregarded company policies, refused to provide financial documents in his possession to Bordwok upon request that were necessary for Bordwok to conduct its business, refused to follow instructions from the General Manager, and took other acts detrimental to Bordwok's best interests.

30.     When Bordwok requested that Mr. Laughlin pay Bordwok to compensate Bordwok for lost profits and the expenses related to the Damen House, Mr. Laughlin and his wife filed this lawsuit against Bordwok and its General Manager.

COUNT I

BREACH OF FIDUCIARY DUTY

(AGAINST MICHAEL LAUGHLIN)

31.     Bordwok incorporates paragraphs 1 through 30 of its counterclaim.

32.     As a Manager of Bordwok, Mr. Laughlin owed Bordwok a duty to act with the utmost good faith and loyalty with respect to Bordwok.

33.     By moving into the Damen House and by residing in the Damen House without authorization and without compensating Bordwok, Mr. Laughlin breached his fiduciary duties to Bordwok.

34.     By failing to provide requested financial documents and records to Bordwok, by commingling company assets with his own assets, and through other acts and omissions that were detrimental to Bordwok's best interests, Mr. Laughlin breached his fiduciary duties to Bordwok.

35.     Mr. Laughlin's breaches of his fiduciary duties have injured Bordwok and impaired its ability to conduct its business.  Bordwok suffered these injuries in the State of Georgia.

36.     Bordwok is entitled to recover all damages from Mr. Laughlin that have been caused by the breaches of his duties.  To date, Bordwok has suffered damages as a result of Mr. Laughlin's breaches of his fiduciary duties in an amount not less than $300,000.00.

COUNT II

PROCUREMENT OF BREACH OF FIDUCIARY DUTY

(AGAINST NICOLE LAUGHLIN)

37.     Bordwok incorporates paragraphs 1 though 36 of its counterclaim.

38.     Ms. Laughlin knew of the fiduciary relationship between Mr. Laughlin and Bordwok.

39.     Ms. Laughlin, acting through advice, counsel, persuasion, or command, procured Mr. Laughlin to breach his fiduciary duties to Bordwok, with the malicious intent of injuring Bordwok and/or benefiting herself and Mr. Laughlin.

40.     Bordwok suffered injury as a result of Ms. Laughlin's acts of procuring the breaches of Mr. Laughlin's fiduciary duties to Bordwok.

41.     Bordwok is entitled to recover from Ms. Laughlin all damages caused by the breaches of fiduciary duty that she intentionally procured.   To date, Bordwok has suffered damages as a result of Mr. Laughlin's breaches of his fiduciary duties in the amount not less than $300,000.00.

COUNT III

UNJUST ENRICHMENT

(AGAINST MICHAEL LAUGHLIN AND NICOLE LAUGHLIN)

42.     Bordwok incorporates paragraphs 1 through 41 of its counterclaim.

43.     The Laughlins have been living in the Damen House and treating it as their personal residence despite the fact that it is a Bordwok project.

44.     Mr. Laughlin represented to Bordwok that they would assume residency of the Damen House only if Bordwok was paid $200,000.00 plus all amounts invested by Bordwok with respect to the Damen House.

45

45.    In reliance upon the original agreement with Mr. Laughlin and the subsequent representations by Mr. and Ms. Laughlin, Bordwok paid 1) all closing costs with respect to the Laughlins' purchase of the Damen House; 2) paid approximately $105,000.00 in mortgage payments on behalf of the Laughlins; and 3) paid approximately $48,000.00 in expenses associated with the renovation of the Damen House.

46.    Contrary to their representations, the Laughlins assumed residency of the Damen House without paying any compensation to Bordwok.

47.    Accordingly, the Laughlins have unjustly retained benefits to Bordwok's detriment, and their retention of such benefits violates fundamental principles of justice, equity, and good conscience.

48.    As a result of the foregoing, Bordwok is entitled to recover damages from the Laughlins in the amount not less than $300,000.00.

COUNT IV

PROMISSORY ESTOPPEL

49.    Bordwok incorporates paragraphs 1 through 48 of its Counterclaim.

50.    At the time the Laughlins purchased the Damen House, Bordwok paid for the closing costs and debt service for the purchase based upon the promises of Mr. Laughlin that the Damen House would be renovated and sold with all profits to go to Bordwok.

51.    When Mr. Laughlin confirmed that his family would like to purchase and move into the Damen House, he promised Bordwok that Bordwok would receive at least $200,000.00 plus any and all costs paid by Bordwok with respect to the Damen House.

52.    Based upon these representations, Bordwok continued to pay for the debt service for the Damen House.

53.     Mr. Laughlin made the above promises with the intention that Bordwok rely upon the promises to Bordwok's detriment.

54.     Bordwok in fact relied upon Mr. Laughlin's promises to its detriment.

55.     Injustice can only be avoided through the enforcement of Mr. Laughlin's promises.

56.     As a result of the foregoing, Bordwok is entitled to recover damages from Mr. Laughlin in an amount not less than $300,000.00.

WHEREFORE, Bordwok prays that the Court render judgment in favor of Bordwok and against Mr. Laughlin and Ms. Laughlin on each count of Bordwok's counterclaim in the amount not less than $300,000.00 plus interest, and that the Court award Bordwok such other and further relief as may be just or proper.

This 9th day of May, 2008.

**BORDWOK ENTERPRISSES, LLC AND DANIEL LUCAS**


By:   /s/ Martin B. Carroll
       One of Their Attorneys


Martin B. Carroll
**FOX, HEFTER, SWIBEL, LEVIN & CARROLL, LLP**
200 West Madison Street, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 224-1230
Facsimile: 312-224-1201
Email: mcarroll@fhslc.com

William V. Hearnburg, Jr.
**SMITH, GAMBRELL & RUSSELL, LLP**
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia  30309
(404) 815-3679

47

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL LAUGHLIN and | ) | |
| NICOLE LAUGHLIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 08 C 1217 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| BORDWOK ENTERPRISES, LLC, | ) | |
| A Georgia limited liability company, and | ) | Magistrate Judge Cox |
| DANIEL LUCAS, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I certify that on May 9, 2008, I served the foregoing Answer to First Amended Complaint and Counterclaim by U.S. first-class mail, postage prepaid, upon the following:

Martin D. Snyder
John S. Letchinger
WILDMAN, HARROLD, ALLEN & DIXON, LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229
Counsel for Plaintiffs

       /s/ Martin B. Carroll
       Martin B. Carroll

Martin B. Carroll
**FOX, HEFTER, SWIBEL, LEVIN & CARROLL, LLP**
200 West Madison Street, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 224-1230
Facsimile: 312-224-1201
Email: mcarroll@fhslc.com

William V. Hearnburg, Jr.
**SMITH, GAMBRELL & RUSSELL, LLP**
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 815-3679